In The
# United States Court Of Appeals
**For The District of Columbia Circuit**

———————————

REUVEN GILMORE, individually and as Administrator of THE ESTATE OF DECEDENT
ESH KODESH GILMORE; ZEHAVA SHEILA GILMORE, individually and as
Administrator of THE ESTATE OF DECEDENT ESH KODESH GILMORE; INBAL
GILMORE individually and as natural guardian of plaintiff T.G.; T.G., minor, by her
next friend and guardian INBAL GILMORE; MALKITZEDEK GILMORE; TIFERET
GILMORE; HEFTZIBAH GILMORE; ELIANA GILMORE;& DROR GILMORE,

*Plaintiffs-Appellants*,

*v.*

PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY; PALESTINIAN LIBERATION
ORGANIZATION; YASSER ARAFAT; FAISAL ABU SHARAH; MAHMOUD DAMARA;
BASHAR AL-HATIB; MUHAND ABU HALIWA; KHALED SUISH; MARWAN BARGHOUTI;
MUSTAFA MAHMUD MISALMANI; MAHMOUD MATAR; ZIAD WAHADAN; & YUSEF
MATIR

*Defendants-Appellees*

———————————

*On appeal from the United States District Court
for the District of Columbia*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Plaintiffs-Appellants,
by their Attorneys,

Kent A. Yalowitz, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690
(212) 715-1113
Kent.Yalowitz@aporter.com

Robert J.Tolchin, Esq.
Meir Katz, Esq.
The Berkman Law Office, LLC
111 Livingston Street, Suite 1928
Brooklyn, NY 11201
(718) 855-3627
rtolchin@berkmanlaw.com
mkatz@berkmanlaw.com

Pursuant to Circuit Rule 28(a)(1), Plaintiffs Wyatt *et al*. hereby file the following certificate of parties, rulings, and related cases.

**(A) Parties and Amici.**   The following is a list of persons who are known to be parties to this case at this time:

Plaintiffs-Appellants: The following persons were Plaintiffs in the District Court and are Appellants in this Court: Reuven Gilmore, individually and as the Administrator of the Estate of decedent Esh Kodesh Gilmore; Zehava Sheila Gilmore, individually and as the Administrator of the Estate of decedent Esh Kodesh Gilmore; Inbal Gilmore individually and as natural guardian of plaintiff T.G.; T.G., minor, by her next friend and guardian Inbal Gilmore; Malkitzedek Gilmore; Tiferet Gilmore; Heftzibah Gilmore; Eliana Gilmore and Dror Gilmore. (On the date this lawsuit was filed Eliana Gilmore and Dror Gilmore were minors represented by their next friends and guardians Reuven Gilmore and Zehava Sheila Gilmore, but they are no longer minors).

Defendants-Appellees: The following were Defendants in the District Court and are Appellees in this Court: The Palestinian Interim Self-Government Authority ("PA"); The Palestine Liberation Organization ("PLO"); Yasser Arafat; Faisal Abu Sharah; Mahmoud Damara; Bashar al-Hatib; Muhand Abu Haliwa; Khaled Suish; Marwan Barghouti; Mustafa Mahmud Misalmani; Mahmoud Matar; Ziad Wahadan; and Yusef Matir.

<u>Intervenors & *Amici*</u>: There were no intervenors or *amici* before the District Court and there are no intervenors and no known *amici* before this Court.

**(B) Rulings Under Review.** The rulings under review are the final judgment entered on August 5, 2014 (DE 383), the July 28, 2014, Order granting summary judgment to Defendants by Judge Gladys Kessler of the U.S. District Court for the District of Columbia (DE 381), the Memorandum Opinion accompanying that Order (DE 382), which appears at *Gilmore v. Palestinian Interim Self-Government Authority*, 53 F.Supp.3d 191 (D.D.C. 2014) and at pages [DE-382[*]] of the Appendix, and the following additional orders of the District Court:

1) The Order denying Plaintiffs default judgment and discovery and vacating Defendants' first intentional default, entered on April 17, 2002 (DE 37), and reproduced at [DE-37].

2) The Order vacating Defendants' second intentional default, entered December 28, 2009 (DE 157), and reproduced at [DE-157]. The order is accompanied by a memorandum opinion, same date (DE 158), which appears at *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 675 F.Supp.2d 104 (D.D.C. 2009), and is reproduced at [DE-158].

---

[*] Unless otherwise noted, parenthetical references refer to the Appendix. "DE" references a document on the docket of the district court. Where a discrepancy exists, specific page citations to a document reference the *page number associated with the ECF date stamp* rather than the number at the bottom of the page.

3) The Order permitting the Defendants to submit *ex parte* documents and a memorandum for *in camera* review, entered May 20, 2013 (DE 311), and reproduced at [DE-311].

4) The Order denying Plaintiffs' motion to compel discovery, entered June 6, 2013 (DE 314), and reproduced at [DE-314].

5) The Order denying Plaintiffs' motion to unseal evidence, entered November 27, 2013 (DE 349), and reproduced at [DE-349]. Amended, same date (DE 350), and reproduced at [DE-350].

6) The Order denying Plaintiffs' renewed motion to unseal evidence, entered March 24, 2014 (DE 364), and reproduced at [DE-364]. The order is accompanied by a memorandum opinion, same date (DE 365), which appears at *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 8 F.Supp.3d 1 (D.D.C. 2014), and is reproduced at [DE-365].

**(C) Related Cases.** This case was previously appealed to this Court following an interlocutory order (Plaintiffs argued that the order was an appealable collateral order). That appeal, docketed as No. 10-7003, was dismissed by order dated July 7, 2010, on the ground that the order appealed from was not likely to be "effectively unreviewable" following appeal from the final judgment. [DE-187, 2]. The mandate issued on August 13, 2010. [DE-187]. Plaintiffs additionally twice

petitioned for writs of mandamus. Those petitions, docketed as Nos. 10-5088, 10-5095, were dismissed by orders dated July 6, 2010.

There are no other related cases within the meaning of Circuit Rule 28(a)(1)(C). However, this case involves the same defendants and similar facts as several other pending and resolved cases. Among them are:

1) *Sokolow v. Palestinian Liberation Org.*, No. 04-cv-397 (S.D.N.Y.) (jury issued a verdict of approximately $655 million on February 25, 2015; final judgment is pending);

2) *Ungar v. Palestinian Auth.*, No. 00-cv-105 (D.R.I.) (case settled following eleven years of litigation); and

3) *Knox v. Palestinian Liberation Org.*, No. 03-cv-4466 (S.D.N.Y.) (case settled following six and one-half years litigation).

# Table of Contents

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES .................. *i*

TABLE OF AUTHORITIES ............................................................. *viii*

GLOSSARY ............................................................................ *xvii*

JURISDICTION ............................................................................ 1

ISSUES ....................................................................................... 1

STATUTORY AUTHORITY ............................................................ 2

STATEMENT OF FACTS ................................................................ 2

    A.   Defendants Murder Esh Gilmore ......................................... 2

    B.   This Litigation ................................................................. 4

    C.   Defendants' First Deliberate Default .................................. 4

    D.   Defendants Tarry While the Court Waits for Over Four Years ................. 5

    E.   The District Court Denies Defendants' Motion to Dismiss, Holding that "Palestine" is not a State ...................... 6

    F.   Following Defendants' Second Deliberate Default, The District Court Grants Motion for Default Judgment ................ 6

    G.   Defendants Participated in the Damages Hearing and Only then Moved to Vacate their Second Intentional Default .................. 7

    H.   The District Court Vacated the Default ................................. 8

    I.   Plaintiffs' Motion for Recusal is Denied ............................. 10

    J.   Before Concluding Discovery, Defendants Moved for Summary Judgment Asserting that Plaintiffs Lack Admissible Evidence ................ 10

    K.   Defendants Finally Disclose the GIS Documents .................... 11

    L.   Without Allowing Plaintiffs to See Even Redacted Versions of Defendants' Submissions and Without Further Briefing or Argument, the District Court Held that the GIS Documents are Neither Relevant nor Admissible ............................................. 12

M. Plaintiffs Renewed Motion to Compel Production of GIS Documents Briefed Relevance and Admissibility, but was Treated as Motion for Reconsideration and Denied................................ 15

N. The GIS Documents Were Supposedly Filed Under Seal ........................ 16

O. Without the GIS Documents, the District Court Granted Summary Judgment.............................................................................. 16

    1. Government Reports ........................................................ 17

    2. Khatib's Statements and Sworn Testimony .................... 17

    3. Maslamani's Custodial Statement.................................. 19

    4. Issacharoff's Deposition and *The Seventh War* ............ 20

    5. The Expert Report of Alon Eviatar ................................ 23

SUMMARY OF ARGUMENT ........................................................ 26

STANDARD OF REVIEW .............................................................. 29

ARGUMENT

I. Judgment Should be Entered Against the Defaulting Defendants........... 29

    A. Vacatur of Defendants' Second Default was Error Under *Livermore* ............................................................................... 31

    B. Alternatively, Vacatur of Defendants' Defaults Was Error Under *Keegel* ................................................................... 32

II. The District Court Improperly Deprived Plaintiffs of the GIS Documents............................................................................. 36

    A. Defendants Waived any Privileges Claims by Failing to Timely Assert Them........................................................ 36

    B. The District Court's *Ex Parte* Review of Legal Argument and Resolution of Legal Questions was Unconstitutional .............. 39

    C. The District Court's Conclusions on Relevance Were Arbitrary and its Conclusions on Admissibility Erroneous and Conclusory................................................................ 41

    D. The Defendants are not Entitled to Comity...................................... 45

    E. Alternatively, the District Court Erred in Applying the Restatement's Comity Factors ........................................ 47

III. Summary Judgment was Improperly Granted...........................................49

    A.    The District Court's Entire Decision is Subject to *De Novo* Review..........................................................................................49

    B.    The Governmental Reports are Admissible ......................................49

    C.    The Credibility of the Israeli Governmental Reports is a Jury Question..........................................................................................51

    D.    Admitting to Killing Someone is a Statement Against Interest .........................................................................................51

    E.    Aweis Remained an "Employee" of the PA Under FRE 801(d)(2)(D) ...................................................................................52

    F.    Aweis's Statement was on a Matter Within the Scope of his Employment .......................................................................................53

    G.    Maslamani's Custodial Statement About Halawa was Against his Interests ..............................................................................54

    H.    Maslamani is "Unavailable" for the Purposes of FRE 804(a)(5)(B)..................................................................................55

    I.    Khatib's Statement at Damara's Trial is Admissible as Former Testimony .............................................................................56

    J.    Khatib's Statement at Damara's Trial is Admissible as a Prior Inconsistent Statement.............................................................57

    K.    The Excerpt From *The Seventh War* is Admissible ..........................58

    L.    Issacharoff's Deposition Transcript is Admissible ..........................59

    M.    Eviatar's Expert Report is Admissible .............................................59

CONCLUSION ..................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM ..............................................................a1

# Table of Authorities

## Constitution

U.S. Const. amend. V ("Due Process") .................................................27, 39-40

## Cases

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C.Cir.1986).........................................40

*Alexander v. F.B.I.*, 186 F.R.D. 113 (D.D.C. 1998) .........................................55

*Aliotta v. Nat'l R.R. Passenger Corp.*,
315 F.3d 756 (7th Cir. 2003) ........................................................................53

*Aspasia Corp. v. M/V STELLA ANN*,
2008 WL 744742 (D. Me. 2008) ..................................................................35

*Bergman v. U.S.*, 565 F. Supp. 1353 (W.D. Mich. 1983).................................42

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) .............................50

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2014 WL 5462496 (N.D. Cal. 2014).............................................................48

*Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) .........................................43

*Chavez v. Carranza*, 2006 WL 2434934 (W.D. Tenn. 2006)............................43

*Chevron Corp. v. Weinberg Grp.*, 286 F.R.D. 95 (D.D.C. 2012)................37-38

*Chicago Ins. Co. v. Paulson & Nace, PLLC*,
783 F.3d 897 (D.C. Cir. 2015)......................................................................29

*Clay v. Johns-Manville Sales Corp.*,
722 F.2d 1289 (6th Cir. 1983) ......................................................................57

*ClearOne Commc'ns, Inc. v. Chiang*,
276 F.R.D. 402 (D.Mass. 2011) ...................................................................55

\* Authorities upon which we chiefly rely are marked with asterisks.

*Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948 (11th Cir. 1996) .......................34-35

*Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249 (4th Cir. 1967) ............................................ 31

*E.E.O.C. v. Bloomberg, L.P.*, 2010 WL 3466370 (S.D.N.Y. 2010) ........................................ 59

*E.E.O.C. v. West Customer Mgmt Group, LLC*, 899 F. Supp. 2d 1241 (N.D. Fla. 2012) .................................................43-44

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005) .................................................. 47

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011) ...............................................46-47

*Entral Grp. Int'l, LLC v. Melody of Flushing Corp.*, 2007 WL 74317 (E.D.N.Y. 2007) .............................................. 34

*Essex Ins. Co. v. Interstate Fire & Safety Equip. Co./Interstate Fire & Safety,* 263 F.R.D. 72 (D. Conn. 2009) ......................................... 37

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009) ............................................. 50

*First Am. v. Price Waterhouse*, 154 F.3d 16 (2d Cir. 1998) ............................ 48

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ......................................................... 47

*Fonville v. D.C.*, 230 F.R.D. 38 (D.D.C. 2005) .........................................36-37

*Franchise Tax Bd. of California v. Hyatt*, 538 U.S. 488 (2003) ...................... 47

*F.T.C. v. Hughes*, 710 F.Supp. 1520 (N.D. Tex. 1989) .................................... 44

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012)....................... 60

*Gilmore v. Palestinian Interim Self-Government Authority*, 53 F.Supp.3d 191 (D.D.C. 2014)................................................*ii*

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
  8 F.Supp.3d 1 (D.D.C. 2014)....................................................................*iii*

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
  No.10-7003, #1253608 (D.C. Cir. July 7, 2010)............................. 9

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
  675 F.Supp.2d 104 (D.D.C. 2009)..........................................................*ii*

*Grant v. City of Pittsburgh*, 98 F.3d 116 (3d Cir. 1996) ................. 44

*Gucci Am. v. Gold Ctr. Jewelry*, 158 F.3d 631 (2d Cir. 1998) ........ 34

\* *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*,
  432 F.2d 689 (D.C. Cir. 1970) ("*Livermore*")........................30-32

*Hilton v. Guyot*, 159 U.S. 113 (1895) .............................................. 47

*Int'l Painters & Allied Trades Union & Indus. Pension Fund v.*
  *H.W. Ellis Painting Co.*, 288 F.Supp.2d 22 (D.D.C. 2003) ...... 34

\* *Jackson v. Beech*, 636 F.2d 831 (D.C. Cir. 1980) .....................30-31

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951)........................................................................ 40

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
  34 F.Supp. 2d 47 (D.D.C. 1998)................................................ 55

\* *Keegel v. Key W. & Caribbean Trading Co.*,
  627 F.2d 372 (D.C. Cir. 1980)..............................................30-35

*Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009) ........................ 47

*Knox v. PLO*, 229 F.R.D. 65 (S.D.N.Y. 2005) ................................... 5

*Knox v. PLO*, 2005 WL 712005 (S.D.N.Y. 2005)............................... 5

*Krewson v. City of Quincy*, 120 F.R.D. 6 (D. Mass. 1988) ............. 38

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................... 59

*Latif v. Obama*, 666 F.3d 746 (D.C. Cir. 2011)................................ 43

*Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013) ..................................... 48

*Linde v. Arab Bank*, 2015 WL 1565479 (E.D.N.Y. 2015) ...................51-52, 54

*Lloyd v. Am. Exp. Lines*, 580 F.2d 1179 (3d Cir. 1978) .................................. 57

*Lohrenz v. Donnelly*, 187 F.R.D. 1 (D.D.C. 1999) .......................................... 37

*Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455 (D.C. Cir. 1984) .................... 39

*Management Investors v. United Mine Workers*,
610 F.2d 384 (6th Cir.1979) ....................................................... 40

*Mandal v. City of New York*,
2006 WL 3405005 (S.D.N.Y. 2006) ................................................. 54, 58

*Manufacturers' Indus. Relations Ass'n v. E. Akron Casting
Co*., 58 F.3d 204 (6th Cir. 1995) ................................................. 31

*Mississippi Poultry Ass'n, Inc. v. Madigan*,
992 F.2d 1359 (5th Cir. 1993) ....................................................... 46

*Nekolny v. Painter*, 653 F.2d 1164 (7th Cir. 1981) ......................................... 52

*New England Mut. Life Ins. Co. v. Anderson*,
888 F.2d 646 (10th Cir. 1989) ....................................................... 57

*Original Appalachian Artworks, Inc. v. Yuil Int'l Trading
Corp.*, 105 F.R.D. 113 (S.D.N.Y. 1985)....................................................... 34

*Pappas v. Middle Earth Condo. Ass'n*,
963 F.2d 534 (2d Cir. 1992) .................................................52-53

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ................................................. 44

*Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v.
Merrill Lynch Pierce Fenner& Smith, Inc.*,
265 F.R.D. 589 (N.D. Fla. 2010).........................................................36-37

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
613 F.3d 220 (D.C. Cir. 2010).................................................... 40

*Price v. Socialist People's Libyan Arab Jamahiriya*,
294 F.3d 82 (D.C. Cir. 2002).....................................................47

*Rep. of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014).....................47

*Rep. of Austria v. Altmann*, 541 U.S. 677 (2004).............................................47

*In re Reuven Gilmore*, No.10-5088,
#1253414 (D.C. Cir. July 6, 2010)..........................................9

*In re Reuven Gilmore*, No. 10-5095,
#1253418 (D.C. Cir. July 6, 2010).........................................10

*Rhines v. Weber*, 544 U.S. 269 (2005)............................................................47

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992)..............................................48

*Ritacca v. Abbott Labs.*, 203 F.R.D. 332 (N.D. Ill. 2001)..........................37-38

*Robinson v. Ergo Solutions, LLC*,
4 F.Supp.3d 181 (D.D.C. 2014)............................................34

*Rule v. Int'l Ass'n of Bridge, Structural & Ornamental
Ironworkers*, 568 F.2d 558 (8th Cir. 1977)..............................57

*Sadrud-Din v. City of Chicago*,
883 F.Supp. 270 (N.D. Ill. 1995)...................................53-54, 58

*S.E.C. v. Yorkville Advisors, LLC*,
300 F.R.D. 152 (S.D.N.Y. 2014).............................................38

*S.W. v. City of New York*, 2010 WL 4791712 (E.D.N.Y. 2010)......................57

*In re Sealed Case (Med. Records)*,
381 F.3d 1205 (D.C. Cir. 2004).............................................39

*Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922 (11th Cir.2007)..........................32

*In re Smith*, 2013 WL 3156639 (Bankr. D.D.C. 2013)...................................35

\* *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court
for S. Dist. of Iowa*, 482 U.S. 522 (1987) ("*Aerospatiale*")...... 14-15, 45-49

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)................................................47

*Spicer v. Com. of Va., Dep't of Corr.*, 44 F.3d 218 (4th Cir.) ..........................44

\* *Strang v. U.S. Arms Control & Disarmament Agency*,
920 F.2d 30 (D.C. Cir. 1990)..............................................................40-41

*Strauss v. Credit Lyonnais, S.A.*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013) ...........................................50, 62

*Tech. Dev. Co. v. Onischenko*,
174 F. App'x 117 (3d Cir. 2006) ......................................................44

*Thorpe v. Thorpe*, 364 F.2d 692 (D.C. Cir. 1966) ..................................30-31, 35

*Tuite v. Henry*, 98 F.3d 1411 (D.C. Cir. 1996) ..................................................29

*U.S. v. AT&T*, 498 F. Supp. 353 (D.D.C. 1980) ..............................................52

*U.S. v. Barrett*, 539 F.2d 244 (1st Cir. 1976)..................................................54

*U.S. v. Constr. Products Research, Inc.*,
73 F.3d 464 (2d Cir. 1996) ..........................................................37-38

*U.S. v. Kirkpatrick*, 589 F.3d 414 (7th Cir. 2009) ..........................................44

*U.S. v. Mejia*, 545 F.3d 179 (2d Cir. 2008)..................................................61-62

*U.S. v. Paracha*, 2006 WL 12768 (S.D.N.Y. 2006) .......................................60

*U.S. v. Paracha*, 313 F. App'x 347 (2d Cir. 2008)..........................................60

*U.S. v. Philip Morris Inc.*, 347 F.3d 951 (D.C. Cir. 2003) ..............................37

*U.S. v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) ..........................................54

*U.S. v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998) ..............................................51

*Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*,
230 F.R.D. 688 (M.D. Fla. 2005) ....................................................37

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983) .......................47

*Wachsman v. Islamic Republic of Iran*,
    603 F. Supp.2d 148 (D.D.C. 2009) ............................................................ 60

*Wells Fargo Equipment Finance, Inc. v. PMRC Services, LLC*,
    2011 WL 635861 (N.D. Ill. 2011) ............................................................ 35

*Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995) ................................... 31, 33-34

*Younger v. Harris*, 401 U.S. 37 (1971) ............................................................ 47

## Statutes and Rules

18 U.S.C.:

    §2333 ............................................................................................... 1

    §2334 ............................................................................................... 1

22 U.S.C. §5201 ................................................................................................ 2

28 U.S.C.:

    §1291 ............................................................................................... 1

    §1331 ............................................................................................... 1

    §1332 ............................................................................................... 1

    §1367 ............................................................................................... 1

Anti-Terrorism Act, 18 U.S.C. §2331 *et seq.* ...................................................... 4

Fed. R. Civ. P.:

    12 ..................................................................................................... 4

    26 ............................................................................................... 36, 55

    30 .................................................................................................... 55

    34 .................................................................................................... 36

    37 .................................................................................................... 36

    55 ............................................................................................... 30, 33

Fed. R. Evid.:

702 ...............................................................................................................59

801 ...................................................................................... 43, 52-53, 57-58

803 ............................................................................................43, 49, 58

804 ..................................................................................... 51-52, 55-57

## **Other Authority**

8 Fed.Prac.& Proc. § 2016.1 ...............................................................................37

10A Fed.Prac.& Proc. Civ. § 2698 ..................................................................31

1993 Advisory Committee Note, Rule 26(b)(5) ..........................................36-38


CRS Report for Congress, *The PLO and its Factions* 3-4 (2002), available
at http://fpc.state.gov/documents/organization/11562.pdf.........................3

Israel Ministry of Foreign Affairs, The Involvement of Arafat, PA Senior
Officials and Apparatuses in Terrorism against Israel: Corruption and
Crime May 6, 2002, *available at* http://mfa.gov.il/MFA/ForeignPolicy/
Terrorism/Palestinian/Pages/The%20Involvement%20of%20Arafat-
%20PA%20Senior%20Officials%20and.aspx............................................2

Sara Rigler, *Holy Fire*, Aish.com, Dec. 30, 2000, http://www.aish.com/
sp/so/48893477.html ..................................................................................3

*Sokolow v. PLO*, No. 04-cv-397 (S.D.N.Y), docket entries:

837 ........................................................................................ 61

907-46 .................................................................................. 50

927-27 ................................................................................ 21-22

927-59 ................................................................................ 21-22

927-60 through 927-82 .......................................................... 43

927-96 through 927-99 .......................................................... 43

## **Glossary**

| **Abbreviation** | **Meaning** |
| --- | --- |
| DE | Docket Entry on the district court's docket in this case (No. 01-cv-853) |
| FRE | Federal Rules of Evidence |
| PA | Palestinian Authority (also known as Palestinian National Authority and Palestinian Interim Self-Government Authority) |
| PLO | Palestine Liberation Organization |

## BRIEF OF PLAINTIFFS-APPELLEES-APPELLANTS

## JURISDICTION

The district court's jurisdiction rested on 28 U.S.C. §§1331, 1332, 1367 and 18 U.S.C. §§2333 and 2334. The district court entered final judgment in favor of Palestinian Interim Self-Government Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively, "Defendants") on July 28, 2014. This court has jurisdiction pursuant to 28 U.S.C. §1291. Plaintiffs-Appellants ("Plaintiffs") timely noticed their appeal on August 22, 2014. [DE-384].

## ISSUES

1.     Were Defendants properly excused from two intentional defaults that prejudiced Plaintiffs?

2.     Did the district court abuse its discretion in permitting Defendants to withhold allegedly privileged intelligence files produced by a non-sovereign on grounds of "international comity" and on the theory that the documents were duplicative of other evidence?

3.     Did the district court properly dismiss the case for lack of evidence on the identity of the shooter of the decedent?

## STATUTORY AUTHORITY

Pertinent portions of the Anti-Terrorism Act are set forth in the Statutory Addendum.

## STATEMENT OF FACTS

### A.  Defendants Murder Esh Gilmore

Defendants, led and directed during the relevant period by Yasser Arafat,[1] are sponsors and facilitators of terrorism.[2] In July 2000, Arafat and Israeli Prime Minister Ehud Barak, together with President Clinton, met at Camp David to reach a peace agreement. It was a failure. Almost immediately thereafter, Palestinian security forces published hostile rhetoric calling for violence against Jews and Israelis. At least one official Palestinian periodical attributed such calls directly to Arafat, stating in his name "Get ready, for the battle of Jerusalem has begun." [DE-342-2,11;DE-342-3,24-25]; (DE 333-4, 4).

---

[1] Regarding Arafat's role as a terrorist, *see*, *e.g.*, Israel Ministry of Foreign Affairs, The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel: Corruption and Crime May 6, 2002, *available at* http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Palestinian/Pages/The%20 Involvement%20of%20Arafat-%20PA%20Senior%20Officials%20and.aspx.

[2] The *Sokolow* jury recently found Defendants liable for six acts of international terrorism. *Sokolow*, No. 04-cv-397 (S.D.N.Y.). Congress separately found "that the PLO [is] a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." 22 U.S.C. §5201.

According to testimony of Mahmoud Damara, a senior commander of Force-17 (an elite Palestinian security unit that guarded Arafat himself) commander, Arafat ordered a "response inside Jerusalem" in early October 2000. [DE-342-3,9-10,26].[3] Arafat's order was simple: commit terrorism in Jerusalem. [DE-342-3,26]. Thus began the Al-Aqsa Intifada.

Less than a month later, on October 30, 2000, a member of Force-17 (a PA employee), acting pursuant to Arafat's order and armed with weapons provided by the PA,[4] arrived at the offices of the National Insurance Institute, the Israeli equivalent of the U.S. Social Security Administration. Decedent, Esh Kodesh Gilmore was then on duty as a private security guard. [DE-342-2,2]. The terrorist opened fire killing Gilmore and injuring another guard.[5] [DE-117-1,1;DE-117-3,1-2;DE-128-1,1].

Following an investigation, Israel's Ministry of Foreign Affairs issued an official statement declaring that a Force-17 terror cell directed by Damara was

---

[3] Damara was the senior ranking officer in Ramallah. He saw Arafat "on an everyday basis," knew him personally, and was part of Arafat's "inner circle." [331-16, 2-3]. Force-17, under Arafat's control, "were frequently involved in acts of violence against Israelis." CRS Report for Congress, *The PLO and its Factions* 3-4 (2002), available at http://fpc.state.gov/documents/organization/11562.pdf.

[4] *See* [DE-331-19, 6, 11].

[5] For a short piece on Gilmore's short but remarkable life, tragic death, and the family he left behind, see Sara Rigler, *Holy Fire*, Aish.com, Dec. 30, 2000, http://www.aish.com/sp/so/48893477.html.

responsible for the shooting attack. [DE-117-1,1]. A later Ministry statement directly attributed the shooting to Force-17 member Abu Halawa (A.K.A. "Mohand Said Muniyer Diriya").[6] IDF Forces killed Halawa in March 2002. [DE-117-3,1-2].

Israel and the U.S. both concluded that Gilmore's murder was a terrorist attack. [DE-342-2,6].

## B.    This Litigation

Gilmore was survived by his young bride and 1-year-old baby girl. [DE-1,9]. On April 18, 2001, his widow, orphan, siblings, and parents filed this case, bringing claims against the PA, PLO, and others under the Anti-Terrorism Act, 18 U.S.C. §2331 *et seq.*, and common law. [DE-1].

## C.    Defendants' First Deliberate Default

Plaintiffs properly served the complaint but Defendants failed to answer. [Docket-sheet,12]. On December 20, 2001, the Clerk entered a default. *Id.* On January 29, 2002, 40 days later and "more than five months" after being served, Defendants filed a motion to dismiss under Rule 12(b) and to vacate default. [Docket-sheet-12-13; DE-73,2;DE-158,2].

The court vacated Defendants' willful default without consequence. [DE-37].

---

[6] *See* [DE-342-2,7-9] (regarding Halawa's role in Force-17).

**D.    Defendants Tarry While the Court Waits for Over Four Years**

Plaintiffs filed their opposition to the motion to dismiss on July 30, 2002. Nearly a year later, on April 14, 2003, after a motion by Plaintiffs for a decision, the court ordered Defendants to reply by May 1, stating they would get no further extensions. [Docket-sheet,14]. On May 1, the court *sua sponte* granted a further 15 day extension. Defendants finally replied on May 15. *Id.*

On April 12, 2004, Defendants sought leave to supplement the record in support of their motion to dismiss. [Docket-sheet,15]. The court granted that request, giving Defendants 45 days. [Docket-sheet,17]. Defendants then sought four extensions of that deadline, ultimately allowing the last of them to expire on January 12, 2005, without filing their supplement. *See* [Docket-sheet,17-18]; (DE 65-1, 1). Over a year later, on January 31, 2006, with the motion to dismiss still outstanding, Defendants moved for a three month stay. [Docket-sheet-18].

Finally, on March 7, 2006, the court decided Defendants' motion to dismiss— 1,498 days after it was filed. [Docket-sheet,19].

This extended delay was typical for these Defendants, who, in other cases, "continually missed deadlines...and required Plaintiffs and the Court to expend substantial resources in a futile effort to obtain Defendants' compliance with discovery orders," resulting in sanctions. *See Knox v. PLO*, 229 F.R.D. 65, 65-71 (S.D.N.Y. 2005); *Knox v. PLO*, 2005 WL 712005 at *6 (S.D.N.Y. 2005).

**E.    The District Court Denies Defendants' Motion to Dismiss, Holding that "Palestine" is not a State**

The court denied the motion to dismiss, but did not punish defendants' dilatory tactics. [DE-74].

Defendants had argued that their sovereign immunity prohibited exercise of subject matter jurisdiction. Rejecting that argument, the court explicitly held that "*Palestine is not a state* and therefore is not entitled to sovereign immunity." [DE-73,7] (emphasis added) (capitalization omitted).

**F.    Following Defendants' Second Deliberate Default, The District Court Grants Motion for Default Judgment**

The court ordered Defendants to answer by April 21, 2006. [Docket-sheet,19-20]; (DE 88, 4-5). Defendants' counsel filed an answer, but later admitted that he did so without Defendants' consent and withdrew it. [Docket-sheet,21-22]. On January 15, 2007, Plaintiffs again moved for entry of default. (By then, Defendants had been in their second willful default for *nine months*. (DE 91-1, 3).) The court granted that motion on January 29, 2007, ordering the clerk to "enter forthwith" default against Defendants, referred the case to a magistrate to conduct a hearing on damages, and ordered "that following the hearing on damages, judgment by default *shall* enter against [the] Defendants." [DE-92] (emphasis added). The clerk entered default the same day. [DE-93].

**G.    Defendants Participated in the Damages Hearing and Only then Moved to Vacate their Second Intentional Default**

In the summer of 2007, the Parties conducted a five-day damages hearing before Magistrate Judge Deborah A. Robinson. [Docket-sheet,24-25]. The testimony was excruciating for Plaintiffs, many of whom continued to suffer months later. (DE 128, 2). Re-living and being questioned about the murder was tremendously difficult. They did it thinking that their testimony would soon bring about resolution of their claims.

Plaintiffs timely filed proposed findings of fact on October 15, 2007. [Docket-sheet,25]. A month later, November 15, Defendants followed. That same day, Defendants filed a motion to vacate their second intentional default—the one that had been entered nearly ten months earlier. [Docket-sheet,25]. They needlessly delayed filing that motion, having decided to do so in the early part of 2007. (DE 107, 9-10); *see* [DE-158,4]. In delaying those "[s]ix months" [DE-158,4], Defendants forced Plaintiffs to go through the very painful process of reliving the murder—in reliance on the court's prior order that "following the hearing on damages, judgment [in their favor] by default shall enter." [DE-92].

Argument on damages proceeded on December 13, 2007. [Docket-sheet,26]. However, the Magistrate Judge did not issue any findings. Finally, two years later, on October 16, 2009, the Magistrate Judge stayed release of her report pending resolution of the motion to vacate default. (DE 141, 3-4).

Plaintiffs timely objected to the Magistrate's order. (DE 144), but the court never ruled on Plaintiffs' objections.

## H.    The District Court Vacated the Default

In December 2009, the court vacated Defendants' second deliberate default. The court balanced several factors in deciding Defendants' motion:

*First*, the court found that Defendants' default was willful, reflecting a "deliberate litigation strategy." Indeed, "Defendants...waited until the damages hearing—in which their new counsel fully participated—had nearly concluded before raising this issue." [DE-158,7-8] ("Defendants *had chosen* not to file an answer" (emphasis in original)).

*Second*, the court held that "Plaintiffs will be prejudiced" by vacatur of default because compelling Plaintiffs to go through a second damages hearing would be an "enormous emotional cost." [DE-158,8-11] (capitalization and internal quotation marks omitted). It also held that "findings of fact must be made while the testimony is fresh in the judge's mind" and that the "cold" written transcripts cannot replace live testimony. [DE-158,11].

*Third*, it held that the Defendants raised a potentially meritorious defense. [DE-158, 11-12].

*Fourth*, the court considered "foreign policy concerns":

> Given the long and violent history in this area of the world, the Court is *reluctant* to take any action that might hinder the process of [peace] negotiations, tedious and drawn out as they have been, or to *exacerbate* existing tensions between adversaries in the region[.] * * *

> Imposing a judgment on Defendants[,] which might well be for millions of U.S. dollars[,] would only worsen the existing economic situation [facing the PA], and might well heighten tensions and animosities in the region.

[DE-158,12-14] (emphasis added). The court found those foreign policy concerns dispositive. [DE-158,16-17] ("[T]he Court is keenly aware that [Plaintiffs] *will suffer prejudice* as a result of this decision[.]" (emphasis added)).

The court also acknowledged "some question as to Defendants' commitment to resolving this [litigation]," referring to some of Defendants' representations as "unmitigated 'chutzpah.'" The court ordered Defendants to post a $1 million bond and pay Plaintiffs' costs and fees, and warned all parties that "'Rambo tactics'" would no longer be tolerated. [DE-157;DE-158,16-19].[7] But Defendants' "Rambo tactics" persisted without consequence.[8]

---

[7] Plaintiffs' appealed, but their appeal was dismissed for lack of appellate jurisdiction. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, No.10-7003, #1253608 (D.C. Cir. July 7, 2010).

Plaintiffs additionally petitioned for a writ of mandamus, which was denied. *In re Reuven Gilmore*, No.10-5088, #1253414 (D.C. Cir. July 6, 2010).

[8] The court allowed Defendants to take great liberty in providing (or withholding) discovery. *See, e.g.*, (DE 176; 215; 230; 235; 241; 244; 250; 251; 267; 275; 276; 279; 283; 290; 308-1; 317; 324; 351; 355; 366); & minute orders dated

## I.     Plaintiffs' Motion for Recusal is Denied

On February 16, 2010, Plaintiffs moved for Judge Kessler's recusal. They argued that her impartiality might reasonably be questioned given her reliance on foreign policy to justify vacatur, indicating a reluctance to issue a large verdict against the PA even on the merits. (DE 169). That motion was denied. (DE 174).[9]

## J.     Before Concluding Discovery, Defendants Moved for Summary Judgment Asserting that Plaintiffs Lack Admissible Evidence

Defendants moved for summary judgment before discovery closed. Their essential position was that Gilmore's murder remains an unsolved mystery. (DE 285).

On September 6, 2012, Plaintiffs responded with a motion for further discovery pursuant to Rule 56(d). (DE 290). They explained that they awaited a ruling from an Israeli court relating to a deposition under the Hague Convention and that expert discovery had not even *begun*. *Id.* at 3-5. On September 19, 2012, the court granted Plaintiffs' motion. (DE 297).

---

Mar. 12, 2012 and July 5, 2012. No doubt, that played a material role in its ultimate conclusion that the Plaintiffs lacked admissible evidence. *See* [DE-382,51].

[9] Plaintiffs petitioned for a writ of mandamus seeking Judge Kessler's recusal. That petition was denied on the ground that Plaintiffs did not meet the very high burden necessary to obtain mandamus relief. *In re Reuven Gilmore*, No. 10-5095, #1253418 (D.C. Cir. July 6, 2010). While Plaintiffs do not appeal the denial of recusal they respectfully request that the case be reassigned on remand.

## K.    Defendants Finally Disclose the GIS Documents

Long earlier, in August 2010, Plaintiffs had served a request for production seeking, *inter alia*, documents related to Halawa (whom Israel had identified as the shooter), Halawa's death, and any payment of death benefits by Defendants to his family. [DE-296-2]. Defendants provided a few documents containing little information and did not serve any privilege log.

On March 4, 2013 (nearly three years late), Defendants served their *first* privilege log relating to Plaintiffs' August 2010 document requests.[10] [DE-303-2]. The privilege log disclosed that the PA's General Intelligence Service ("GIS") (the PA's FBI) was in possession of documents responsive to the 2010 document requests relating to Halawa (referenced as "Deireia"), convicted PA terrorist Mustafa Maslamani, and Damara—all of whom were explicitly named in Plaintiffs' August 2010 requests. *Id.* [DE-303-1,1-2]; *see also* [DE-296-2].[11] Defendants offered no

---

[10] Defendants mislabeled this document "*Supplemental* Privilege Log."

[11] This was not the first time Defendants had concealed responsive documents from Plaintiffs. In May 2012, Plaintiffs' counsel obtained (by pure happenstance, *not* from Defendants) a copy of a file from a PA agency concerning a terrorist and PA employee named Fawzi Murar, who was killed in the same IDF operation that killed Halawa. [DE-117-3,1]. Murar's file referenced Halawa. (DE 290, 11). After seeing that file, Plaintiffs demanded that Defendants produce the complete "martyr" file for Halawa, which was responsive to Plaintiffs' 2010 document requests. Halawa's long-concealed and late-produced PA "martyr" form describes Halawa as one of "the outstanding activists of the Al[-]Aqsa Intifada and the military wing of the Fatah movement, the Al[-]Aqsa Martyrs Brigades." The Al-Aqsa Martyrs

explanation for their tardy disclosure. [DE-303-1,3]. As Plaintiffs explained to the court based on their counsel's experience in other cases against these Defendants:

> Files generated by [the] GIS...are an invaluable source of information regarding both the activities of terrorist perpetrators and the PA's own knowledge of such activities[.]

[DE-303-1,2].

On April 19, 2013, Plaintiffs moved to compel production of the GIS files, arguing, *inter alia*, that any privilege was waived. [DE-303]. The court ordered Defendants to file the responsive GIS documents under seal and *ex parte* for its review. It also invited Defendants to submit an *ex parte* "explanatory Memorandum" in apparent response to Defendants' request to submit sufficient factual background for the court to understand the documents in their context. [DE-311];[DE-388,14].

## L. Without Allowing Plaintiffs to See Even Redacted Versions of Defendants' Submissions and Without Further Briefing or Argument, the District Court Held that the GIS Documents are Neither Relevant nor Admissible

After reviewing the documents and legal memorandum submitted by Defendants "under seal, *in camera*, and *ex parte*," the court denied Plaintiffs' motion to compel production of the GIS documents. [DE-314,1]. The court wrote that it

---

Brigades, a designated foreign terrorist organization, is the military wing of Fatah, the dominant faction of the PLO and the party of both Arafat and Abbas. *See* [DE-342-3,12,27]; *see also* [DE-331-19,11].

"considered the legal arguments made by both [*sic*] Parties," *id.*, notwithstanding that Plaintiffs never had the opportunity to see or respond even to redacted versions of Defendants' *ex parte* submissions.

The court's ruling was not based on privilege or waiver of privilege. Instead, said the court, none of the 25 pages[12] submitted by Defendants contained "admissible evidence that would be *relevant* to Plaintiffs' case" *because*, "there is no information in the files revealing advance knowledge on the part of the PA of the October 30, 2000, shooting." [DE-314,2] (emphasis added). It stated that the files of Halawa and Damara do not contain any documents that predate Gilmore's murder. *Id.* The court did not say whether these PA's documents contain information revealing Halawa's terrorist activities, the central issue on which it ultimately granted summary judgment. *See id.* Nor did the court explain why PA documents would be irrelevant, even if they contain information about the identities of Gilmore's murderers, simply because they were created after the murder.

It added, without any further explanation, that documents in Mislamani's file pre-dating the shooting would not "be admissible at trial." [DE-314,2].

And it found that some of the GIS documents duplicate other evidence in Plaintiffs' possession but did not specify what that evidence was. [DE-314,2].

---

[12] At a deposition, Defendants stated that there were 27 pages. [DE-388, 32].

The court then applied a five-factor test appearing in *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.28 (1987), governing "international comity," *see Aerospatiale*, 482 U.S. at 543-44 & n.28, notwithstanding its prior holding that Palestine is not a state. It held dispositive a sealed declaration, submitted *ex parte* and supported by Defendants' *ex parte* memorandum, in which a GIS official argued that disclosure "would 'undermine important interests' of the PA." [DE-314,2-3].

Plaintiffs objected to the court's holdings on admissibility and relevance because these issues had not been briefed. It appeared to Plaintiffs from the court's order and based on statements by Defendants' counsel, *see* [DE-319-3] (DE 327, 2-3), that Defendants' *ex parte* submissions went beyond factual discussion. Plaintiffs reminded the court that the purpose of Defendants' *ex parte* memorandum was to facilitate *factual* development, not legal argument, and requested that the court either unseal Defendants' submissions after making appropriate redactions or else inform Plaintiffs about matters covered by Defendants' *ex parte* filings. [DE-319]; (DE 319-1, 1-2).

The court denied that motion on November 27, 2013, again relying on *Aerospatiale* for its consideration of relevance and admissibility. [DE-350,2].[13] It

---

[13] The motion before the court did not argue that the court could not consider relevance and admissibility under any circumstances. It argued only that the court

indicated that, indeed, some of the information or argument in Defendants' *ex parte* submissions had not been disclosed to Plaintiffs. [DE-350,3] (using the qualifier "virtually"). But it held that, under *Aerospatiale*, those documents need not be disclosed because Defendants claimed (in their *ex parte* filing) that disclosure would be harmful to the interests of the PA. [DE-350,2].

The court added a line reminiscent of its grounds for vacating default and so perhaps revealing its ultimate reason for denying Plaintiffs access to the GIS documents: Disclosure of the GIS documents "would increase the risk of disrupting diplomatic relations with foreign governments." *Id.*[14]

## M. Plaintiffs Renewed Motion to Compel Production of GIS Documents Briefed Relevance and Admissibility, but was Treated as Motion for Reconsideration and Denied

On December 23, 2013, Plaintiffs renewed their motion to compel production of the GIS documents, noting that in *Sokolow*, Defendants were compelled to release (over similar objections) many GIS documents. (DE 352, 4-5). In that motion, Plaintiffs briefed the admissibility and relevance of the GIS documents for the first

could not do so relying on *ex parte* communications and without giving Plaintiffs an opportunity to respond. (DE 319-1, 4-6). Confusingly, the cited portion of *Aerospatiale* says nothing about *in camera* and *ex parte* submissions.

[14] The court did not explain how it would "disrupt[] diplomatic relations" to order disclosure of intelligence files relating to an individual killed more than a decade ago who was identified as a murderer in official public statements.

time and argued that they were entitled to *de novo* consideration of those issues. (DE 352, 3-9 & nn.2, 5). In support, Plaintiffs submitted an expert declaration explaining the significance of a GIS file in resolving a case such as this and why release of the GIS documents would inflict no injury on the Defendants. [DE-352-2,2-4]. It provided sufficient factual assertions to demonstrate the admissibility of the GIS documents. [DE-352-2,5-6].

On March 24, 2014, the court held the motion to be a motion for reconsideration, applied a heightened standard of review, and denied the motion. [DE-364];[DE-365,8-11,18].

## N. The GIS Documents Were Supposedly Filed Under Seal

By minute order on September 12, 2014, the court ordered Defendants to file under seal all of the documents that were previously submitted *in camera*. [Docket-sheet-69];[DE-386,1 (listing those documents)]. Three days later, Defendants filed some documents under seal, which may or may not represent all documents submitted *in camera*. (DE 387).

## O. Without the GIS Documents, the District Court Granted Summary Judgment

The court reviewed Plaintiffs' non-GIS evidence and, finding it to *all* be hearsay, granted summary judgment. [DE-381]. This included the following evidence:

### 1. Government Reports

As noted, the Government of Israel published two reports on the murder. The first provided information on Force-17, asserting its responsibility for Gilmore's murder. [DE-117-1]. The second specifically identified Halawa as the shooter. [DE-117-3].

### 2. Khatib's Statements and Sworn Testimony

Convicted PA terrorist Bashar Al-Khatib was the commander of Force-17 in the West Bank city of Beitunia. [DE-331-9,2]. He has given a variety of statements about the Gilmore murder. After being arrested in April 2002, Khatib gave several self-inculpatory statements to police investigators, providing information on crimes he committed with Damara and Halawa. *See* [DE-331-9::12]. In particular, Khatib discussed the attack on Gilmore, identifying Halawa as the perpetrator:

*Question*: Tel[l] me about the murder that you participated in.

*Answer*: This was at the beginning of the intifada in 2001, I think. One day Mahmoud Damra...asked me to come to him in his office and...I met...Muhanad Abu Halawa, and...Mahmoud told me that he wanted me to drive Muhanad and another young man to the area of the Old City, for them to carry out a shooting attack there....

*Question*: Did Mahmoud Damra say what your job would be in this attack?

*Answer*: Yes, he said that I would...have to show them the place where the national insurance office is in Azfahani Street.... The plan was for

Omar to be the driver and I would show them the place and Muhanad was the one who would shoot the national insurance guards....

I and Muhanad arranged to meet the following day...at the [Force-17] office in Ramallah.... [W]e traveled through the[border] checkpoint and from there we drove to Salah A Din Street and ate hummus there, at Au Ali's place, it was about 11:00 a.m. and at about twelve we left.... Omar drove the automobile. Muhanad sat next to him and I was in the back....

[T]he plan was that Omar would drop Muhanad off with the pistol in Al Masouda Street and then Omar would drive with the car to Salah A Din Street and would drop me off there... and after Muhanad would shoot at the guard he would flee to the car where Omar would be waiting for him and they would drive through Salah A Din and pick me up too and from there we would escape.

*Question*: How is it that you know the place well?

*Answer*: I would go to Jerusalem a lot some time ago and this is a place that I know well and I have family inWadi Goz.

After I got out of the car, after about ten minutes, Omar and Muhanad arrived with the car and I got into the car.... Muhanad [said] that he had gotten out of the car and shot the guards and fled to the car and that is it…

[DE-331-10,2-5]. At his deposition, Khatib authenticated this statement. [DE-330-5,18]. But roughly 24 hours after making it, without explanation, he partially recanted, saying that he personally "did not participate in this attack." He did not, however, retract his statement that Halawa shot Gilmore. [DE-331-11,5]. Roughly 33 hours after that, he withdrew his reservations of the day prior and told a slightly different story—with far less detail and embellishment—that had him playing an

unsubstantial and unknowing role in supporting the attack. [DE-311-12,2-3]. One critical piece remained constant: "Muhanad Abu Halawa was the one who shot the guards." [DE-331-12,3].

Several years later, Khatib was called as a prosecution witness in Damara's criminal trial in Israel. When he first appeared in the courtroom, he hugged and kissed Damara. [DE-331-18,1]. He then contradicted portions of his post-arrest statements, was uncooperative, and was declared a hostile witness. [DE-331-18,4-8]. He denied having any involvement at all in the Gilmore attack. Yet he still *explicitly affirmed* that "everything that [I] have said about Muhannad Abu Halawa...is correct." [DE-331-18,16-18]. Subsequently, at his deposition in this case, Khatib was belligerent, refusing even to state what documents he reviewed prior to the deposition or with whom he spoke. He denied any knowledge whatsoever about the attack on Gilmore or Halawa's role. [DE-330-5].

### 3. Maslamani's Custodial Statement

Like Khatib, Maslamani has given a variety of statements about the Gilmore murder. On January 18, 2001, while in custody of Israeli police, Maslamani dictated and signed a statement that reads, in part:

> I myself, [Abu Hallawa,] and Khaled were in a coffee house in Ramallah and the three of us were talking...and...Abu Hallawa [said that] he perpetrated terrorist attacks, and I remember him saying:...I carried out terrorist attacks [including one at the] Bituach Leumi[, the

National Insurance Institute, where Gilmore was shot[15]].... Abu
Hallawa said that he was not alone there and he was brought from
Ramallah to Jerusalem by Bashar Al[-K]hatib, a 38-year-old guy from
Jerusalem who...serves today as an officer of Force 17. [Abu Halawa]
said that[Khatib] took him to Jerusalem....

[DE-128-1,1].

During Plaintiffs' deposition of Maslamani in 2001, Maslamani contradicted
his written custodial statement. But later, in 2003, Maslamani agreed to have that
custodial statement admitted as evidence against him in his criminal trial in Israel.
*See* [DE-331-7,28]. Under Israeli law, so admitting the statement constituted an
admission of each of the facts contained within the statement. [DE-342-4,11-14].
Plaintiffs attempted to depose Maslamani again after he consented to the admission
of this statement (DE 198), but were unable to do so because, by then, he had been
released from prison (DE 285, 11-12) and sent to Gaza, which is controlled by
Hamas. Plaintiffs have no means to compel his testimony.

### 4.    Issacharoff's Deposition and *The Seventh War*

In 2004, Avi Issacharoff published a book called *The Seventh War*, which
states, in part:

Abu Halawa of Ramallah, a member of Fatah and Force 17, Arafat's
Presidential Guard, burst into the branch of the National Insurance

---

[15] Only one shooting has ever happened at any National Insurance Institute
office (DE 330-8, 9-12), so references to an attack there are necessarily to the murder
of Gilmore.

Institute in East Jerusalem. Abu Halawa shot to death an armed guard, Esh Kodesh Gilmore, seriously wounded another Israeli and fled from the scene. He returned to Ramallah and from there he phoned Abdel Karim Aweis, a member of the General Intelligence apparatus from Jenin.... Abu Halawa told Aweis that he wanted to announce to the media that he assumed responsibility for the East Jerusalem attack on behalf of a new military wing of Fatah.

[DE-333-12,3]; *see also* [DE-330-9,77-82].[16] The account in the book derives Issacharoff's conversations held with a number of persons, including Abdel Karim Aweis, a convicted PA terrorist. [DE-330-9,66-67]. At his deposition, Issacharoff testified that he spoke with Aweis in prison; Aweis stated that he spoke with Halawa about a day after Gilmore's murder. [DE-330-9,80-82].[17] As Defendants note, Aweis too testified that he spoke "with Issacharoff about Abu Halawa." (DE 285, 16). At the time of his deposition, Aweis was (and remains to this day), a PA GIS intelligence officer.[18] Two documents, available on the public docket in *Sokolow*,

---

[16] The original Hebrew text appears at [DE-333-12,5] and was authenticated by Issacharoff. [DE-330-9,53-57]. The English translation is certified. (DE 347, 10).

[17] Issacharoff testified that Aweis spoke with him willingly, without duress, and was not restrained in any way during their conversation. [DE-330-9,70-74] ("He was pretty interested in talking to me.").

[18] In their, Summary Judgment Motion [Docket-sheet,53], Defendants implied that Aweis was employed with the PA only until 2002. (DE 285, 16). During his 2011 deposition, Aweis testified (inaccurately) about his employment status with the PA. (DE 351-1, 5). Plaintiffs learned based on subsequent disclosures in the *Sokolow* case that Aweis is still an employee of the PA and Defendants' statement and Aweis' uncorrected deposition transcript were misleading at best. (DE 351, 4).

No. 04-cv-397 (S.D.N.Y.) (entries 927-27 (Exhibit 58) and 927-59 (Exhibit 128)), demonstrate that Aweis was promoted by "Presidential Orders" effective October 1, 2006, and again by "Military Course" on June 1, 2011. *Sokolow* Exhibit 58. One document admits that as of June 9, 2010, Aweis "*is* one of the [Palestinians'] intelligence officers[.]" (emphasis added) (written in the present tense). *Sokolow* Exhibit 128, 7-8. That page and another, written approximately two months later, are official PA requests for medical treatment for Aweis' son by virtue of his position in the PA.

Issacharoff testified that, in addition to Aweis, he spoke with approximately ten other people for the purpose of corroborating Aweis' statements, at least some of whom were employees, officers, and/or associates of the PA or PLO. [DE-330-9,83,85-86,92]. *All* ten of them verified that Halawa participated in the Gilmore murder. [DE-330-9,86]. Issacharoff affirmed that everything that he wrote about the Gilmore attack is accurate and no one has ever told him otherwise. [DE-330-9,86-87].

Issacharoff personally entered the information that he derived from those interviews into his computer while the interviews were still fresh in his mind. [DE-330-9,75]. With the passage of time following the publication of his book, he forgot the names of his sources. (DE 304, 4).

### 5.     The Expert Report of Alon Eviatar

Alon Eviatar has an M.A. in Public Policy and fluency in Hebrew, Arabic, and English. [DE-342-3,1]. He is a Lieutenant Colonel with a 27 year career as an intelligence officer of the Israel Defense Forces ("IDF"), specializing in Palestinian Affairs. [DE-342-3,1-2]. As an intelligence officer, Eviatar was regularly involved in collecting, assessing, weighing, and interpreting intelligence about Palestinian terrorism, and then drawing conclusions and making recommendations based on his analysis. [DE-342-3,5,13].

After his retirement in 2013, he analyzed the available evidence in this case, together with relevant secondary sources, and opined: "[I]t is very likely, and certainly more likely than not, that Muhanad Abu Halawa [murdered] Gilmore." [DE-342-3,13].

Eviatar provided background with respect to Fatah, Force-17 and Halawa. In addition, he examined each of the pieces of evidence described *supra*. *First*, he found the Israeli government reports significant. Israel, Eviatar explained, did not make "formal, public accusations of this type" without taking great care to ensure their accuracy. He explained that falsely accusing the PA of engaging in terrorism would have harmed Israel's credibility, particularly with the U.S., which Israel guarded with zeal. [DE-342-3,13-14]. Israel was particularly reluctant about making such accusations in the early stages of the Intifada, when it was not yet widely accepted

that PA leadership was affirmatively directing, not merely tolerating, terrorism. [DE-342-3,14]. Accordingly, said Eviatar, the very fact that Israel authorized publication of such reports in 2001-02 indicates a high degree of certainty on Israel's part that the report is accurate, and in Eviatar's line of work as an intelligence officer, it is "strong evidence that Abu Halawa [murdered] Gilmore." [DE-342-3,6,14-15].

*Second*, Eviatar found persuasive the excerpt from Issacharoff's book *The Seventh War* and his deposition testimony. Eviatar followed Issacharoff's work on Palestinian affairs for many years, describing it as some of the "most important and respected electronic and print media" in the field. [DE-342-3,16]. He found Issacharoff to be "knowledgeable, thorough, unbiased[,] and honest." *Id.* He stated, therefore, that if he had been asked to assess Gilmore's murder as part of his work with the IDF, he would have considered *The Seventh War* and Issacharoff's deposition testimony as "strong and reliable evidence...that Abu Halawa was...the killer." *Id.*

Eviatar found Aweis' statement to Issacharoff to be highly credible, noting in particular that Aweis "had nothing to gain" by fabricating his story. [DE-342-3,21].

*Third*, Eviatar considered the 2001 Maslamani police statement, in which Maslamani, a "terrorist associate[]" of Halawa, recalled Halawa explicitly admitting responsibility for the Gilmore murder. Due to the close relationship between Maslamani and Halawa, Maslamani "had the opportunity to discuss other terrorist

attacks...with Abu Halawa, and presumably had Abu Halawa's trust[.]" [DE-342-3,19-20].

Eviatar acknowledged that Maslamani's deposition testimony in this case differs from his prior statement, but concluded that from the point of view of an intelligence analyst (based on professional experience, expertise, and observation of Maslamani's hostility during the deposition), Maslamani's prior statement to police is more reliable.

*Fourth*, Eviatar noted that Khatib's pre-litigation statements "are consistent in identifying Abu Halawa as the perpetrator." [DE-342-3,17]. Just like Maslamani, Khatib was a close associate of Halawa. They worked together in Force-17 and on numerous terrorist attacks. It is likely, said Eviatar, that Halawa confided in Khatib. Khatib's consistent statements that Halawa killed Gilmore are "evidence, from a source and of the type I [Eviatar] would have taken into account, if I had been tasked to assess responsibility for this attack during my IDF and Defense Ministry career." [DE-342-3,18].

Eviatar acknowledged that Khatib's deposition testimony contradicted his prior statements. He concluded, based on his professional experience, expertise, his observation of Khatib's hostility during his deposition, and his identification of other inconsistent statements in Khatib's deposition testimony, that from the point of view of an intelligence analyst, Khatib's repeated prior statements that Halawa killed

Gilmore were more reliable than Khatib's deposition testimony. [DE-342-3,18-19];

*see also* [DE-342-4,9-10].

Eviatar concluded:

[B]ased on the various...sources [that] unanimously point[] to...Abu Halawa as the perpetrator, ...all of which are the types of evidence, sources[,] and data that would be considered and relied upon by Palestinian affairs specialists in the IDF and the [Israeli] Defense Ministry, I conclude that it is significantly more likely than not that Abu Halawa was in fact [Gilmore's] murderer.

[DE-342-3,21].

## SUMMARY OF ARGUMENT

1.      The district court vacated Defendants' two willful defaults; Defendants were in default for 40 days the first time and nine months the second before seeking vacatur. The court did so despite acknowledging that the defaults subjected Plaintiffs to considerable prejudice. It granted the second motion only after Defendants participated in a post-default damages hearing at which Gilmore's widow, daughter, parents, and siblings testified about the murder, while Defendants concealed their intent to move for vacatur.

Willful default should not be vacated where the defaulting party is unresponsive and raises the specter of interminable delay. Even when assessing the default of a responsive party, vacating a default requires balancing three factors: willfulness, prejudice, and whether the defaulting party has a meritorious defense.

The court ignored both of those rules and instead improperly focused on political considerations. It based its decision on a "reluctan[ce] to take any action that might hinder the process of [peace] negotiations...or to exacerbate existing tensions between adversaries in the region." [DE-158,12-13].

2. During discovery, Defendants collected responsive reports from the GIS, a PA intelligence agency. They first acknowledged having them some two-and-a-half years after receiving pertinent document requests (long after moving for summary judgment and arguing that Plaintiffs lacked admissible evidence) by presenting a late and inadequate privilege log claiming that the documents are privileged. In so doing, they waived any privilege that they might have otherwise had.

In *Sokolow*, this exact conduct resulted in a holding that defendants had waived any claim of privilege and multiple orders compelling production. Those GIS documents were admitted at trial in *Sokolow* and proved highly relevant.

Here, the court chose a different path: It reviewed the documents (and an *ex parte* legal memorandum about them) *in camera* and concluded they were inadmissible and irrelevant. That violated Plaintiffs' Due Process rights. And it placed the court in the position of trying to understand the significance of the GIS documents without a background or assistance adequate to that task.

In holding the GIS documents non-discoverable, the court made striking errors. It held that documents written after Gilmore's murder are not relevant *per se*. That holding defies explanation. It additionally held that the documents are duplicative of other evidence in Plaintiffs' possession. But it would later hold that duplicative evidence to be inadmissible, without revisiting its conclusion as to the GIS documents. And it somehow concluded that the GIS documents themselves are inadmissible (notwithstanding that the GIS documents are plainly admissible as business records, government reports, and party admissions), but it offered no explanation for that conclusion.

Principally, the district court relied on the notion that the Defendants, non-sovereign governmental entities, are entitled to comity notwithstanding that every authority on the topic ties comity to sovereignty. The court had previously concluded that the Defendants are not sovereign. Denying Plaintiffs access to the GIS documents on comity grounds was erroneous.

3.      Finally, the district court granted summary judgment on the merits to Defendants by concluding that all the evidence that Halawa murdered Gilmore was inadmissible hearsay. (It did not consider GIS documents). The court's hearsay conclusions were incorrect, and effectively took the case from the jury by finding every statement incriminating Halawa incredible and every statement recanting the

incriminations credible. The court's hearsay determinations do not withstand scrutiny.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*. *Chicago Ins. Co. v. Paulson & Nace, PLLC*, 783 F.3d 897, 900 (D.C. Cir. 2015). The facts must be viewed in the light most favorable to the non-moving party. *Id.* Questions of law "are *also* subject to *de novo* review." *Id.* (emphasis added).

Discovery orders are generally reviewed for abuse of discretion, however, when premised on an error of law, they are deemed "arbitrary." *Tuite v. Henry*, 98 F.3d 1411, 1415 (D.C. Cir. 1996).

## ARGUMENT

### I. Judgment Should be Entered Against the Defaulting Defendants

Defendants twice intentionally defaulted in this case. The court twice vacated their default. The second of those vacaturs came after an order stating "that following the hearing on damages, judgment by default *shall* enter against [the] Defendants." [DE-92] (emphasis added). Only after Defendants fully participated in that five-day highly emotional damages hearing and allowed Plaintiffs to waste considerable effort in compiling their findings of fact did Defendants move for their second

vacatur. The court found Defendants' delay to be highly prejudicial to Plaintiffs, but granted vacatur anyway, citing a desire for Mid-East peace.

Rule 55(c) provides that default may be set aside "for good cause." This Court has developed a two-part inquiry governing that standard. *First*, the Court considers whether one of the parties was "essentially unresponsive." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980). When one party's failure to participate fully in the litigation poses the specter of "interminable delay and continued uncertainty," the rights of the diligent party must be protected through the default process. *H. F. Livermore v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970). Moreover, default creates a meaningful deterrent to those who wish to engage in dilatory tactics. *Id.* Allowing an unresponsive defaulting party out of its default undermines both the protections and deterrents of the default system. Therefore, when the default was caused by the defaulting party's unresponsiveness, default is generally not vacated. *See, id.*; *Jackson*, 636 F.2d at 836.

*Second*, when the defaulting party defaulted "in a formal sense" but "indicated...a clear [intent] to defend the suit," the Court employs a three-factor balancing test: The reviewing court must consider "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious." *Keegel v. Key W. & Caribbean Trading*, 627 F.2d 372, 373 (D.C. Cir. 1980). In addition, this Court requires the defaulting party to demonstrate

"reasonable promptness" in moving to vacate default. *Thorpe v. Thorpe*, 364 F.2d 692, 694 (D.C. Cir. 1966); *see also* 10A Fed.Prac.&Proc.Civ. §2698 ("[C]ourts have required that [Rule 55(c) motions] be made promptly upon discovery of the default[.]"); *Consolidated Masonry & Fireproofing v. Wagman Constr.*, 383 F.2d 249, 251 (4th Cir. 1967) (finding a delay of over two months to be unreasonable).

Failure to apply the proper test—whether the "essentially unresponsive" test or the *Keegel* balancing test—is error. *Jackson*, 636 F.2d at 836-37. When, as here, a court improperly vacates default, the remedy is to set aside vacatur and remand for entry of judgment. *Whelan v. Abell*, 48 F.3d 1247, 1259-60 (D.C. Cir. 1995). Federal courts of appeal will reverse erroneous relief from default even where the defendant prevailed before the trial court. *See Manufacturers' Indus. Relations Ass'n v. E. Akron Casting*, 58 F.3d 204, 210 (6th Cir. 1995).

## A.  Vacatur of Defendants' Second Default was Error Under *Livermore*

Indubitably, Defendants were "essentially unresponsive" here. After being properly served, Defendants did absolutely nothing for more than five months. [DE-158,2]. They did not even make their first appearance in the case until 40 days after the clerk's entry of default. Several years later, after the court denied Defendants' motion to dismiss and ordered Defendants to file their answer by April 21, 2006, [Docket-sheet,20], Defendants did virtually *nothing* for a whole year. Then,

Defendants failed to respond to Plaintiffs' second motion for entry of default (DE 91-1, 3), allowing the Clerk to enter a second default against them. [Docket-sheet,22-23]. Their next filing did not occur until some *three months* later, when, on May 25, 2007, their new counsel did not challenge the default, but merely moved to postpone the damages hearing. [Docket-sheet,23]. By participating in the post-default damages hearings without seeking to vacate default, Defendants effectively endorsed and adopted the default.

This is precisely the type of behavior that motivated *Livermore*, necessitating protections for the diligent party and repercussions for those who wish to use "interminable delay and...uncertainty" as a litigation tactic. *See also Sloss Indus. v. Eurisol*, 488 F.3d 922, 935 (11th Cir. 2007) (refusing to vacate where defendant's motion was delayed "over three and a half months after it was served with process, and over one month after the default judgment was entered."). Pursuant to *Livermore*, that should have been the end of the inquiry.

## B. Alternatively, Vacatur of Defendants' Defaults Was Error Under *Keegel*

Compounding one error with another, the court failed to apply *Keegel* correctly. It acknowledged Defendants' willful conduct and the prejudice it imposed on Plaintiffs. But rather than balancing those against the Defendants' meritorious defense as required by *Keegel*, 627 F.2d at 373, it based its decision on a

"reluctan[ce] to take any action that might hinder the process of [peace] negotiations...or to exacerbate existing tensions between adversaries in the region." [DE-158,12-13].

1.    In applying *Keegel*, the court, included "foreign policy concerns" in the mix of factors that govern Rule 55(c). *Sua sponte*, it offered its own analysis of Mid-East politics and expressed a "reluctan[ce]" to "exacerbate existing tensions" in part by "[i]mposing a judgment on Defendants[,] which might well be for millions of U.S. dollars." [DE-158,12-14]. That desire for world peace, held the court, was "good cause" under Rule 55(c) and *Keegel* to vacate a second willful default. This added "factor" seems to have tipped the balance. The court cited no case in which this factor (or *any* factor not stated or hinted to in *Keegel*) had ever been applied.

2.    The court also failed to attach adequate weight to *Keegel's* willfulness and prejudice prongs; either mistake renders vacatur an abuse of discretion. *Whelan*, 48 F.3d at 1259.

Prejudice alone is sufficient to "tip[] the balance" where vacatur will necessitate redundant litigation. *Id.* at 1259-60. Here, Defendants *purposefully* allowed a five-day hearing on damages resulting from a murder to proceed, knowing that they would subsequently move to vacate default. That act was not merely cruel

to the Gilmore family, it was also so highly prejudicial as to be dispositive.[19] *Id.*;

*Original Appalachian Artworks v. Yuil Int'l Trading*, 105 F.R.D. 113, 118 (S.D.N.Y.

1985) ("The damages inquest has already been held.... Defendants waited until after

the commencement of the damages proceeding to try to reopen the issue of liability.

Under these circumstances, it would prejudice plaintiff to vacate the default[.]");

*Entral Grp. Int'l v. Melody of Flushing*, 2007 WL 74317 at *4 (E.D.N.Y. 2007)

(same).

Similarly, when default is found to be knowing and deliberate, that generally

ends the *Keegel* inquiry. Indeed, Plaintiffs are not aware of any other case in which

a party was excused from *two* intentional defaults. Finding a case in which a party

was excused from a single intentional default is a challenge. *Robinson v. Ergo

Solutions*, 4 F.Supp.3d 181, 186 (D.D.C. 2014) ("The Court has found no case where

a court set aside a default judgment in the face of a willful default, and several cases

suggest that a finding of willfulness is virtually dispositive."); *see also Int'l Painters

& Allied Trades v. H.W. Ellis Painting*, 288 F.Supp.2d 22, 26 (D.D.C. 2003); *Gucci

Am. v. Gold Ctr. Jewelry*, 158 F.3d 631, 634-35 (2d Cir. 1998); *Compania

Interamericana Exp.-Imp.. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951-

---

[19] Plaintiffs were prejudiced in numerous other ways as well. For example, Defendants' excessive delay caused the Issacharoff deposition to be delayed until after he forgot the names of his sources. Plaintiffs thus lost valuable opportunities for additional discovery.

52 (11th Cir. 1996). The fact that Defendants, after being excused from a prior intentional default, repeated their dilatory behavior is exceptional and should have been factored into the *Keegel* analysis. Yet, the court appears to have ignored Defendants' prior intentional default when assessing their claim to "good cause" for vacatur.

3. Finally, Defendants do not come close to satisfying *Thorpe's* "reasonable promptness" requirement. To the contrary, Defendants waited five months after being served before making an appearance. [DE-158,2]. They later waited eleven months after receiving a letter from the State Department advising them to litigate in good faith and six months after obtaining new counsel before saying a word about vacating their *second* intentional default. [DE-158,7-8]. They decided that the conclusion of the damages inquest was a good time to raise the issue. *Id.* In the face of such delay, no good cause for vacatur could be shown. *Thorpe*, 364 F.2d at 694; *see also*; *In re Smith*, 2013 WL 3156639 at *3 (Bankr. D.D.C. 2013); *Wells Fargo Equipment Finance v. PMRC Services*, 2011 WL 635861 at *2 (N.D. Ill. 2011) (nearly three-month delay in filing Rule 55(c) motion reflected a "lackadaisical approach to rectifying the default," counseling against vacatur); *Aspasia Corp. v. M/V STELLA ANN*, 2008 WL 744742 at *2 (D. Me. 2008) ("I can find no case recognizing that counsel's change of strategy six months after actual notice of the entry of default and following the close of discovery is good cause.").

## II. The District Court Improperly Deprived Plaintiffs of the GIS Documents

### A. Defendants Waived any Privileges Claims by Failing to Timely Assert Them

In March 2013—years after receiving Plaintiffs' August 2010 request for production of documents and some six months after filing a summary judgment motion premised on alleged lack of evidence—Defendants disclosed, via a privilege log, the existence of responsive GIS documents in their possession. They refused to produce those documents, claiming purported state secrets and law enforcement privileges. [DE-303-2].

Rule 26(b)(5)(A) provides that a party withholding a document on a claim of privilege must "describe the nature of the documents...not produced or disclosed—and do so in a manner that...will enable other parties to assess the claim." The 1993 advisory committee note to Rule 26(b)(5) explains that withholding "materials without such notice is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege or protection." Under Rule 34(b)(2), the recipient of a request for production has 30 *days* to state its objections and produce a privilege log. *Fonville v. D.C.*, 230 F.R.D. 38, 42 (D.D.C. 2005). Defendants here waited over 30 *months*.

"There is abundant district court case law…holding that a party claiming privilege is obliged to produce a privilege log and its failure to do so means the

privilege is waived." *Pensacola Firefighters' Relief Pension Fund v. Merrill Lynch*, 265 F.R.D. 589, 592, 594 (N.D. Fla. 2010); *see also U.S. v. Philip Morris.*, 347 F.3d 951, 954-55 (D.C. Cir. 2003). The same is often true when the party claiming privilege submits a log that is excessively late. 8 Fed.Prac.&Proc. §2016.1; *see also*, *e.g.*, *Essex Ins.. v. Interstate Fire & Safety Equip.*, 263 F.R.D. 72, 77 (D. Conn. 2009) (five months delay in producing privilege log considered "flagrant delay tactic"); *Universal City Dev. Partners. v. Ride & Show Eng'g*, 230 F.R.D. 688, 695 (M.D. Fla. 2005) (eight-month delay considered excessive); *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335-36 (N.D. Ill. 2001) ("[E]vidence of foot-dragging or a cavalier attitude towards following court orders and the discovery rules supports finding waiver."). Courts in this Circuit have so held. *See*, *e.g.*, *Fonville*, 230 F.R.D. at 42 (holding that failure to properly object under Rule 34 for 125 days constituted waiver); *Lohrenz v. Donnelly*, 187 F.R.D. 1, 7 (D.D.C. 1999). Defendants' decision to wait more than two-and-a-half years before serving a privilege log constitutes waiver.

A timely but inadequate privilege log can also constitute waiver. An adequate privilege log is one that enables the opposing party to assess, simply by reviewing the log, "whether the claim of privilege is valid." *Chevron Corp. v. Weinberg Grp.*, 286 F.R.D. 95, 98 (D.D.C. 2012) (discussing deficient privilege log); *U.S. v. Constr. Products Research*, 73 F.3d 464, 473 (2d Cir. 1996) (same); *see also* 1993 Advisory

Committee Note to Rule 26(b)(5). A deficient privilege log is not a privilege log at all. *See*, *e.g.*, *Constr. Products Research*, 73 F.3d at 473; *Chevron*, 286 F.R.D. at 101; *S.E.C. v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 157-58, 162-67 (S.D.N.Y. 2014) (S.E.C. waived privilege by failing to provide sufficient information in its privilege log, despite having provided *vastly* more information than Defendants did here); *Krewson v. City of Quincy*, 120 F.R.D. 6, 7 (D.Mass. 1988). When a privilege log fails to accomplish its intended objectives, its submission does nothing other than inform the other party of an improper failure to disclose documents. Certainly when that improper activity is intentional, it constitutes waiver. *Ritacca*, 203 F.R.D. at 336.

Recognizing the gross inadequacy of their first privilege log, Defendants served a second one. But Defendants' second privilege log was also inadequate: It offered no basis whatsoever for Plaintiffs or the court to determine whether Defendants' claim of privilege was properly asserted. The log did not state who wrote each of the documents, what the documents say (even in the most general terms) or *why* Defendants believed that privilege was available. *See* [DE-303-3].

Defendants' assertion of privilege was therefore waived as both fatally untimely and insufficient. Yet, the court never even reached the question of waiver. Its failure to do so requires reversal.

## B. The District Court's *Ex Parte* Review of Legal Argument and Resolution of Legal Questions was Unconstitutional

When a timely and detailed privilege log still does not enable the court to resolve privilege questions, it may conduct an *in camera* review to assess the privilege claim. *In re Sealed Case (Med. Records)*, 381 F.3d 1205, 1218 (D.C. Cir. 2004); *Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984).[20] But, here, the court *did not even reach privilege*. Instead, it rested on questions of relevance and admissibility that no party had briefed (except perhaps in Defendants' *ex parte* memorandum). *See* [DE-314]. Neither Plaintiffs' motion nor Defendants' opposition mentioned relevance or admissibility, except in passing. [DE-303;DE-303-1;DE-307].

Reaching those questions without giving Plaintiffs the opportunity to see or respond to Defendants' evidence and *ex parte* arguments and without giving Plaintiffs any fair opportunity to argue relevance and admissibility was a violation of their Fifth Amendment due process rights. Due Process requires that litigants be provided access and an opportunity to respond to the claims of opposing parties. "It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment. The openness of judicial

---

[20] However, *in camera* review "is not a substitute for [a party claiming privilege] to provide detailed public indexes and justifications whenever possible," which Defendants did not do here. *Lykins*, 725 F.2d at 1463.

proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts." *Abourezk v. Reagan*, 785 F.2d 1043, 1060-61 (D.C.Cir. 1986) *aff'd*, 484 U.S. 1 (1987); *see also*, *e.g.*, *Management Investors v. United Mine Workers*, 610 F.2d 384, 390 (6th Cir. 1979) (by ruling on defendants' motion without permitting plaintiffs to respond, court "denied plaintiff his due process right to be heard"); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, *J.*, concurring) ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights.").

As this Court has explained, "[o]nly in the most extraordinary circumstances does our precedent countenance court reliance upon *ex parte* evidence to decide the merits of a dispute." *Abourezk*, 785 F.2d at 1061 (D.C. Cir. 1986). A litigant "must be given an opportunity to respond to [its adversary's] submissions and arguments." *Strang v. U.S. Arms Control & Disarmament Agency*, 920 F.2d 30, 32 (D.C. Cir. 1990) (*per curiam*); *see also People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-31 (D.C. Cir. 2010).

When a party makes a submission for *in camera* review, the court must distinguish the confidential materials from those that are not and must order the disclosure of the non-confidential materials. *Strang*, 920 F.2d at 30-31. As a result, courts may not hold an *ex parte* hearing on the issue of privilege "without disclosing to the plaintiff all of the defendant's evidence that could be disclosed without

violating a valid claim of privilege." *Id.* at 31 (reversing and remanding). Here, the court denied Plaintiffs the right to see even redacted versions of Defendants' *ex parte* filings without ever offering a justification.

## C. The District Court's Conclusions on Relevance Were Arbitrary and its Conclusions on Admissibility Erroneous and Conclusory

The GIS documents are relevant and admissible.

1. The court read the GIS documents and concluded that they were not sufficiently relevant to warrant compelled production. But there are numerous reasons to question that conclusion. *First*, the court is not an expert on Palestinian terrorism, and it may not have understood the documents without the help of plaintiffs' counsel and contextual expert testimony. *Second*, the court reviewed not the original GIS documents but rather translations of those documents. It is quite possible that, if given the chance, Plaintiffs would have offered different translations that would altered the court's interpretation of the documents. *Third*, the court does not have access to any of the evidence that Plaintiffs could have presented to support the admissibility of the GIS documents had they been able to view them—including expert foundational witnesses. It thus lacks the ability to appreciate how the GIS documents may fit into the puzzle or how foundation can be laid for them. *Fourth*, it was error for the court to require the Plaintiffs' to lay foundation for PA documents

produced by Defendants after the close of discovery; having denied Plaintiffs the chance to develop the admissibility of these PA documents, Defendants should have been precluded from challenging their admissibility.

Indeed, "fact finding following an *in camera* inspection by the Court [is] unjust" because "it would be humanly impossible for the court or a magistrate to glean every piece of significant evidence in this case." *Bergman v. U.S.*, 565 F.Supp. 1353, 1363 (W.D. Mich. 1983). That is part of the reason we employ an adversarial discovery system: The *parties* explain why individual pieces of evidence are significant and how they fit together to tell a story, only after which does the fact finder determine which story is more credible. GIS documents might appear at first glance unusual to American eyes. But, properly understood, they can offer highly damaging admissions; they are very probative.

2.      The court held that the GIS documents are not relevant because many of them post-date Gilmore's murder. *E.g.* [DE-314,2-3]. The date on which a document was created is not a factor in assessing admissibility or relevance. The GIS is an intelligence agency. Part of its mission is to gather evidence about events that already happened and use that evidence to guide recommendations and predictions in the future. It is very likely that the GIS examined Gilmore's murder to understand what happened and who was responsible. Thus, the documents that it compiled after the murder are highly *likely* to be relevant. The court's contrary

assumption (which it either created *sua sponte* or adopted from Defendants *ex parte*) is unfounded.

3.    The court found that some of the GIS documents duplicate other evidence in Plaintiffs' possession. *E.g.* [DE-314,2]. But the court later held *all* of that evidence hearsay. [DE-382,50-51]. The court's exclusion of GIS documents on the ground that they were duplicative was an abuse of discretion in light of the court's subsequent holdings that the duplicative evidence is not admissible.

4.    The GIS documents are obviously admissible, as Judge Daniels held in *Sokolow*.[21] They are admissible not only business records, created by an agency of the PA in the regular course of its business, but also PA government reports and party admissions.[22], *See* FRE 801(d), 803(6); 803(8); *Chavez v. Carranza*, 559 F.3d 486, 497-98 (6th Cir. 2009); *Chavez v. Carranza*, 2006 WL 2434934 at *6-7 (W.D. Tenn. 2006) (intelligence report admissible under Rules 803(6) and 803(8)); *see also Latif v. Obama*, 666 F.3d 746, 747, 754-55 (D.C. Cir. 2011); *E.E.O.C. v. West Customer Mgmt. Group, LLC*, 899 F.Supp. 2d 1241, 1250 (N.D. Fla. 2012) (interview notes on party's own forms made by its interviewers were either business

---

[21] Some of the GIS documents admitted in *Sokolow* are available on the public docket at No. 04-cv-397 (S.D.N.Y.) docket entries 927-60 through 927-82 and 927-96 through 927-99.

[22] They reflect the analysis of the author of the document (a PA employee) and they contain non-party statements that have been adopted by the PA.

records or party admissions); *F.T.C. v. Hughes*, 710 F.Supp. 1520, 1523 (N.D. Tex. 1989).

5.      The court's analysis on admissibility was wholly conclusory. To offer one example, it wrote, without analysis or support, that there are two references in Mislamani's GIS file to the terror attack at issue, but "[n]one of the information contained in those two portions would be admissible at trial." [DE-314,2]. Conclusory statements as such are deemed arbitrary and not entitled to deference. *Tech. Dev. Co. v. Onischenko*, 174 F. App'x 117, 120-21 (3d Cir. 2006); *see also Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (Agee, *J.*, concurring) ("The district court's analysis and rationale…was, to be charitable, perfunctory and conclusory; to be accurate, it was plainly arbitrary and capricious and an abuse of the district court's discretion."); *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) (remanding to remedy conclusory statements); *U.S. v. Kirkpatrick*, 589 F.3d 414, 415 (7th Cir. 2009) ("When a variance is carefully explained, appellate review is deferential. But when a sentence appears to be chosen arbitrarily, it is problematic."); *Spicer v. Com. of Va., Dep't of Corr.*, 44 F.3d 218, 233-34 (4th Cir.) (Niemeyer, *J.*, dissenting), *rev'd* 66 F.3d 705 (4th Cir. 1995) (*en banc*) ("The majority's efforts to fill gaps left by the district court are not only ill advised, but they amount, in my judgment, to blind deference to the district court's single conclusory statement made in lieu of factual findings.").

6.     Of course, the GIS documents themselves were not the only evidence lost due to Defendants' delay and the court's decision—if these documents had been timely produced, Plaintiffs would have been able to identify and obtain an untold number of additional witnesses and documents (both independently relevant and admissible) on the basis of the information reflected in the GIS documents. The summary judgment record would likely have been very different.

### D.  The Defendants are not Entitled to Comity

The court relied heavily on *Aerospatiale*, a decision that relates to the comity owed to foreign nations.[23] It held that two of the five factors outlined in a footnote in *Aerospatiale* were dispositive: Namely, "the importance to the...litigation of the documents" and "the extent to which...compliance with the request would undermine important interests of the *state* where the information is located." *Aerospatiale*, 482 U.S. at 544 n.28 (emphasis added)). [DE-314,2-3]; [DE-350,2]; [DE-365,4-6,14-15]. Notably, the court seemed to agree that, were it not for *Aerospatiale*, the documents were not privileged; it stated that "absent the special considerations present here" (namely, Defendants' governmental interests), the GIS documents would be discoverable. [DE-365,13-15].

---

[23] The court's conclusion to the contrary was purely legal and is subject to *de novo* review.

The comity discussion in *Aeropastiale* addresses the respect for the sovereignty of foreign nations. It indicates that comity applies when a foreign sovereign is asked to assist parties in discovery. *Aerospatiale*, 482 U.S. at 524, 543-44. Comity does not apply simply because one of the litigants happens to be foreign, regardless of the fact that no sovereign state is being asked to do anything. (DE 352, 12-15); *Mississippi Poultry Ass'n, Inc. v. Madigan*, 992 F.2d 1359, 1367 (5th Cir. 1993), *aff'd* 31 F.3d 293 (5th Cir. 1994) (*en banc*). The court ignored this, citing, out of context, to *Aeropastiale's* general admonition two paragraphs later that "American courts...should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." *Aerospatiale*, 482 U.S. at 546. [DE-365,14-15]. That language does not support depriving Plaintiffs of another party's responsive documents in its possession, custody, and control just because the other party is a foreign entity. In any event, there is no risk that Defendants might be disadvantaged here on account of their foreign status—the GIS documents were written by Defendants who have free access to them and complete control over whether to release them.

Finally, international comity is not applicable to non-sovereigns like the PA and the PLO. *Id.* at 543 n.27, 544 n.29; *Mississippi Poultry*, 992 F.2d at 1367; *Empress Casino Joliet. v. Balmoral Racing Club*, 651 F.3d 722, 725 (7th Cir. 2011)

(Posner, *J.*) (defining "comity" as "respect for another sovereign"); *Rep. of Argentina v. NML Capital*, 134 S. Ct. 2250, 2255 (2014); *see Rep. of Austria v. Altmann*, 541 U.S. 677, 688-89 (2004); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 761 (2004) (Breyer, *J.*, concurring); *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626 (1983); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *Hilton v. Guyot*, 159 U.S. 113, 163-66 (1895); *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009); *Empagran S.A. v. F. Hoffmann-LaRoche*, 417 F.3d 1267, 1271 (D.C. Cir. 2005); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 98 (D.C. Cir. 2002); *cf. Rhines v. Weber*, 544 U.S. 269, 274 (2005); *Franchise Tax Bd. of Calif. v. Hyatt*, 538 U.S. 488, 499 (2003); *Younger v. Harris*, 401 U.S. 37, 44 (1971).

As the court correctly held, the PA is not sovereign. [DE-73,7]. Therefore, neither Defendant is entitled to comity.

### E. Alternatively, the District Court Erred in Applying the Restatement's Comity Factors

Assuming, *arguendo*, that the Restatement section cited by *Aeropastiale* were relevant, the court failed to properly balance its factors. It considered just two of them, the first (importance of the documents) and the fifth (whether compliance would "undermine important interests of the [foreign] state"), finding them dispositive. [DE-350, 2]; *Aerospatiale*, 482 U.S. at 544 n.28. It ignored the

Restatement's three other factors: the specificity of the request, whether the information originated in the U.S., and whether the requesting party has alternative means of obtaining the documents. *Id.* There is no doubt that Plaintiffs' requests were adequately specific and that Plaintiffs have no other means of obtaining the GIS documents. Plaintiffs' inability to access the documents from other sources itself weighs "strongly in favor of production." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 5462496 at *6 (N.D. Cal. 2014).

Further, the Restatement's factors, at least as understood by *Aerospatiale*, are not exhaustive. *Aerospatiale*, 482 U.S. at 544 n.28; *Richmark v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992). In terrorism cases, there is undoubtedly another important factor to consider: "the important U.S. and international interests in preventing [terrorism]." *Linde v. Arab Bank*, 706 F.3d 92, 111-12, 115 (2d Cir. 2013) (noting that the U.S.'s interests must factor into the discovery analysis). This is an action under the Anti-Terrorism Act for Defendants' involvement in terrorism. To the extent the GIS documents help prove Defendants' liability, this will help vindicate the U.S.'s important interest in combating terrorism. This *bona fide* U.S. interest weighs heavily into the comity analysis.

Finally, many courts have considered "the good faith of the party resisting discovery" in their comity analysis. *E.g.*, *First Am. v. Price Waterhouse*, 154 F.3d 16, 22 (2d Cir. 1998); *Aerospatiale* 357 U.S. at 208-13 (expressly considering good

faith). It is logical that comity (a special privilege afforded other sovereigns out of mutual respect) ought to be contingent on good faith participation.

* * * *

On October 14, 2014, Plaintiffs requested that this Court order production of the GIS documents and permit supplemental briefing concerning those documents. On February 5, 2015, that motion was referred to this Panel. Plaintiffs respectfully request that the motion be granted.

## III.    Summary Judgment was Improperly Granted

### A.  The District Court's Entire Decision is Subject to *De Novo* Review

The court concluded that Plaintiffs have no non-hearsay evidence that Halawa shot Gilmore and granted summary judgment in reliance on that conclusion. [DE-382,50-51]. Its holding is thus one on summary judgment and rests on conclusions of evidentiary law. It is subject to *de novo* review.

### B.  The Governmental Reports are Admissible

The Israeli Government issued two reports concerning the Gilmore shooting. These reports are admissible as public records pursuant to FRE. 803(8) and are not lacking in trustworthiness. FRE 803(8) "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public

inspection to which many such records are subject will disclose inaccuracies."
*Bridgeway v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (internal quotation marks
and citation omitted). "'Factual finding' includes not only what happened, but how
it happened, why it happened, and who caused it to happen. The rule therefore
renders presumptively admissible 'not merely…factual determinations in the narrow
sense, but also…conclusions or opinions that are based upon a factual
investigation.'" *Id.* (citation omitted).

These reports reflect factual findings concerning Force-17 and Halawa
resulting from a legally authorized investigation. These types of reports have been
admitted in other cases (*see*, *e.g. Sokolow* Plaintiffs' Exhibit 354, No. 04-cv-397
(S.D.N.Y.) (docket entry 907-46) (a materially similar document)) and are likewise
admissible here. *E.g.*, *Strauss v. Credit Lyonnais*, 925 F.Supp.2d 414, 448 (E.D.N.Y.
2013) ("Hamas' responsibility for the March 7 and April 30 Attacks are supported
by conclusions of public Israeli government reports that are admissible as hearsay
exceptions."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F.Supp.2d 141, 159 (D. Conn. 2009) (conclusions of official foreign
investigation admissible as hearsay exception).

## C. The Credibility of the Israeli Governmental Reports is a Jury Question

The court trivialized these two government reports as "press releases." But Plaintiffs' expert explained generally how the Israeli government researches such reports and the seriousness with which they are taken. He indicated that Israel spends considerable time fact checking and assuring itself of the accuracy of the material in such reports before releasing them. He further testified that, in his professional activities he would have considered the reports to be the product of a serious investigation and thus reliable. [DE-342-3,13-15].

Here, given this evidence, a jury could assign credibility to those reports. The court improperly usurped that role.

## D. Admitting to Killing Someone is a Statement Against Interest

The court held that statements by terrorists such as Aweis and Halawa cannot be statements against interest under FRE 804(b) because terrorists like to kill people and flaunt it. [DE-382,26-27,34-35].

But the subjective preferences of the declarant are irrelevant. FRE 804(b)(3)(A) speaks of "a reasonable person in the declarant's position" and does not compel courts to determine the declarant's subjective thoughts. *See U.S. v. Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998); *Linde v. Arab Bank*, 2015 WL 1565479 at \*43 (E.D.N.Y. 2015) (expressly disagreeing with the district court in this case,

holding that "claiming responsibility for a terrorist attack is plainly against Hamas' penal interest."). A reasonable person in Halawa's position would not have admitted to killing Gilmore if it were not true. There is no "terrorist exception" to FRE 804(b)(3)(A) and the district court erred by creating one.

### E. Aweis Remained an "Employee" of the PA Under FRE 801(d)(2)(D)

FRE 801(d)(2)(D) provides that a statement "made by the party's agent or employee on a matter within the scope of that relationship" is not hearsay when offered against that party. Aweis was indisputably still an officer in the GIS and was being paid by the PA when he told Issacharoff that Halawa killed Gilmore. Nonetheless, the court held that Aweis was not then an "employee" because Aweis ceased to serve the PA once he was incarcerated. [DE-382,28-29].

An employee's statements against the interests of his employer are admissible as a "result of the adversary system," much like a concession in a stipulation. *U.S. v. AT&T*, 498 F.Supp. 353, 357-58 (D.D.C. 1980) (quoting the Advisory Committee notes and McCormick, Evidence, §262). Employee statements are presumed to be correct—and with good reason: An employee is 1) "unlikely to make statements damaging to his principal or employer unless those statements are true," *Nekolny v. Painter*, 653 F.2d 1164, 1172 (7th Cir. 1981); *Pappas v. Middle Earth Condo.*, 963

F.2d 534, 537 (2d Cir. 1992), and 2) "usually the person best informed about certain acts committed in the course of his employment." *Id.*

Although Aweis was in prison when he spoke with Issacharoff, he was still employed by the PA, continued to be promoted in rank, and continued to receive salary and benefits (such as medical treatment for his family) corresponding to his employment and rank. Thus, he remained loyal to the PA such that a jury could determine whether his statements harmful to the PA's interests are likely to be factual. He was an "employee" of the PA for purposes of FRE 801(d)(2)(D).

### F. Aweis's Statement was on a Matter Within the Scope of his Employment

Aweis, a GIS intelligence officer in a government agency that makes it its business to know about terrorist activities in Israel and the West Bank spoke about facts he had learned regarding an act of terrorism in East Jerusalem. That he was speaking on a matter within the scope of his employment involving gathering "intelligence related to terrorist attacks" [DE-382,27-32], is clear. *See Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003) ("The only requirement is that the subject matter of the admission match the subject matter of the employee's job description."); *Sadrud-Din v. City of Chicago*, 883 F.Supp. 270, 274 (N.D. Ill. 1995) ("[O]ut-of-court statements by employees of the Chicago Police Department" that are about their "working relationship" with another officer, the

emotional condition of that officer, and the actions of other colleagues, "are admissible [under FRE801(d)(2)(D)]."); *Mandal v. City of New York*, 2006 WL 3405005 at *2-3 (S.D.N.Y. 2006).

As a GIS intelligence officer, Aweis was likely unusually well informed about intelligence related to Gilmore's murder and is thus one of the best informed people within the PA to recount the PA's intelligence gathering efforts on that topic. As (apparently) the only person in the GIS contacted by Halawa after the murder, he is certainly "the person best informed" about his conversation with Halawa.

## G. Maslamani's Custodial Statement About Halawa was Against his Interests

Maslamani's written statement, implicating Halawa as Gilmore's murderer, reveals a very close "professional" association between him and several terrorists, such as Halawa. Evidence of a close professional association with Force-17 terrorists and an intimate knowledge of specific terror operations (*see* [DE-128-1]) is self-inculpatory. Contrary to the court's holding, that statement was and remains against Maslamani's interests. [DE-382, 42]; *U.S. v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *U.S. v. Barrett*, 539 F.2d 244, 249-51 (1st Cir. 1976); *Linde*, 2015 WL 1565479 at *46 (statement about membership in terrorist organization is against penal interest).

## H. Maslamani is "Unavailable" for the Purposes of FRE 804(a)(5)(B)

After his deposition in this case, Maslamani admitted in an Israeli court to the entirety of his prior custodial statement, thus repudiating his deposition testimony to the extent it was inconsistent with the custodial statement.[24] Accordingly, the court allowed Plaintiffs, over Defendants' objections, to re-depose Maslamani via a Hague Convention request to the Israeli government. (DE 198).[25]

However, in October 2011, before that second deposition could be arranged, Maslamani was released from Israeli prison and sent to Gaza. (DE 285, 11-12). Accordingly, Plaintiffs were unable take that second deposition regarding Maslamani's adoption of his statement regarding the Gilmore murder. Maslamani is thus "unavailable" under FRE 804(a)(5)(B).

---

[24] The court stated that "Plaintiffs do not cite any evidence indicating that Maslamani agreed to the admission of his statement as it related to the [murder of Gilmore]." [DE-382,41]. That is incorrect. The uncontroverted Kaufman expert declaration demonstrated that every part of Maslamani's statement (including the part related to Gilmore) was admitted. [DE-342-4,11-14].

[25] Plaintiffs were *entitled* to a new deposition under Rules 26(b)(2), 30(a)(2)(A)(ii). *See Alexander v. F.B.I.*, 186 F.R.D. 113, 119-20 (D.D.C. 1998); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 34 F.Supp. 2d 47, 54-55 (D.D.C. 1998); *ClearOne Commc'ns, Inc. v. Chiang*, 276 F.R.D. 402, 404 (D.Mass. 2011).

# I.  Khatib's Statement at Damara's Trial is Admissible as Former Testimony

At Damara's trial, Khatib testified that all his prior written statements about Halawa—in which he discussed Halawa's murder of Gilmore—were correct. He was later deposed in this action and denied having any knowledge of Gilmore's murder. His prior sworn testimony at Damara's trial is admissible as a statement against interest just as is Maslamani's statement.[26] It is also admissible as former testimony under FRE 804(b)(1).

FRE 804(b)(1)(A) provides that the prior testimony must have been given, *inter alia*, by a witness at trial. This describes Khatib's testimony at Damara's trial precisely. FRE 804(b)(1)(B) demands that Defendants or a "predecessor in interest" had opportunity to cross-examine Khatib. They certainly did. *First*, Defendants actually did cross-examine Khatib during his deposition in this case. [DE-330-5,29-30,78]. *Second*, nearly every court to consider the question has interpreted the "predecessor in interest" language of FRE 804(b)(1)(B) to include any other party

---

[26] The court doubted that Khatib's statements at Damara's trial were intended as an affirmation of his prior written statements about Halawa. It noted that immediately preceding Khatib's affirmation of those prior statements, Khatib was asked about a different attack. [DE-382,37-39]. The court ignored that Khatib was questioned at length about the Gilmore attack immediately before being asked just *four* questions about the other attack. This was followed by Khatib's affirmation of *all* his written statements regarding Halawa. *See* [DE-331-18,16-18].

that had "like motive to develop the testimony about the same material facts." *New England Mut. Life Ins. v. Anderson*, 888 F.2d 646, 651 (10th Cir. 1989); *Lloyd v. Am. Exp. Lines*, 580 F.2d 1179, 1184-87 (3d Cir. 1978); *see also Clay v. Johns-Manville Sales*, 722 F.2d 1289, 1294-95 (6th Cir. 1983); *Rule v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 568 F.2d 558, 569 (8th Cir. 1977); *S.W. v. City of New York*, 2010 WL 4791712 at *2 (E.D.N.Y. 2010) *aff'd*, 2012 WL 1100906 at *2 (E.D.N.Y. 2012). Damara and the PA had similar motives in developing Khatib's testimony about Halawa, because Damara, a senior PA officer, was being tried, *inter alia*, for ordering Khatib and Halawa to carry out terror attacks.

FRE 804(a)(5) provides that the former testimony may be used if the proponent of the testimony cannot procure the declarant's appearance at trial. Khatib is beyond the jurisdiction of this Court. Plaintiffs cannot compel his appearance.

### J. Khatib's Statement at Damara's Trial is Admissible as a Prior Inconsistent Statement

Khatib's testimony at Damara's trial in which he affirmed the truth of his prior written statements about Halawa was "subject to" cross examination both at Damara's trial [DE-331-18,21] and at his deposition in this case [DE-330-5,78].

FRE 801(d)(1).[27] That statement is inconsistent with his deposition testimony that he knows nothing about Halawa killing Gilmore. It is thus admissible as a prior inconsistent statement under FRE 801(d)(1)(a).

### K.  The Excerpt From *The Seventh War* is Admissible

A factual accounting or report is admissible, provided that the report is a recorded recollection described by FRE 803(5). *Mandal*, 2006 WL 3405005 at *2-3; *Sadrud-Din*, 883 F.Supp. at 274.

Issacharoff testified (and it is not disputed) that he wrote the relevant excerpt of *The Seventh War* while the information relayed to him about Gilmore's murder by Aweis and others PA/PLO officials was still fresh in his mind, that he cannot recall enough of the account (particularly, the names of those with whom he spoke) to testify fully, and that the excerpt accurately reflects Issacharoff's knowledge. *See* FRE 803(5). It is thus admissible as a recorded recollection. *Mandal*, 2006 WL 3405005 at *4; *Sadrud-Din*, 883 F.Supp. at 274.

---

[27] The district court wrote that Khatib was not cross-examined. [DE-382, 37]. That is incorrect [DE-331-18, 21]. In any event, FRE 801(d)(1) requires only that the declarant be "subject to" cross-examination.

## L. Issacharoff's Deposition Transcript is Admissible

Even if *The Seventh War* were not admissible, Issacharoff's deposition transcript is sworn testimony and is independently admissible. There, Issacharoff states that he learned that Halawa killed Gilmore not just from Aweis, but also from at least ten other people, including additional PA/PLO officials.

## M. Eviatar's Expert Report is Admissible

Alon Eviatar, an IDF Lieutenant Colonel with 27 years of experience in intelligence in the area of Palestinian affairs, is a qualified expert under FRE 702. The court rejected his testimony, incorrectly holding that Eviatar 1) failed to identify and apply a particular methodology [DE-382,44] and 2) based his analysis "entirely on hearsay" without applying "any specialized knowledge" beyond that of a layperson thereby usurping the jury function." [DE-382,50]. This was error.

*First*, FRE 702 does not require that experts follow scientific principles even when the expert comes from a social science filed where "the research, theories and opinions cannot have the exactness of hard science methodologies." *E.E.O.C. v. Bloomberg,* 2010 WL 3466370 at \*14 (S.D.N.Y. 2010). The test for reliability of an expert is flexible; an expert must employ only "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 152 (1999).

An expert in fields other than natural science, particularly including those involved in terrorism cases, will often

> gather[] multiple sources of information, including original and secondary sources, cross-check[] and juxtapos[e] new information against existing information and evaluat[e] new information to determine whether his conclusions remain consonant with the most reliable sources.

*U.S. v. Paracha*, 2006 WL 12768 at *20 (S.D.N.Y. 2006) *aff'd,* 313 F. App'x 347 (2d Cir. 2008) ("[T]he court was well within its discretion in ruling that Kohlmann's methodology was sufficiently reliable and his testimony relevant to the jury's understanding of al Qaeda so as to be admissible under [FRE] 702[.]"). This is exactly what Eviatar did. His 28-page report contains a detailed discussion citing a wealth of supporting materials, including many primary source documents and a wide variety of secondary materials. He applied his expertise as a 27-year veteran of the IDF, specializing in intelligence in the area of Palestinian affairs, where he learned to collect, assess, weigh, interpret and draw conclusions about Palestinian terrorism, to do just that with regard to the perpetrators of the Gilmore attack.

Intelligence and terrorism expert reports like Eviatar's have been accepted in other terrorism cases. *See*, *e.g.*, *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 523, 533-34 (E.D.N.Y. 2012); *Wachsman v. Islamic Rep. of Iran*, 603 F.Supp.2d 148, 153, n. 1 (D.D.C. 2009). Indeed, Eviatar himself, using precisely the same methodology and

similar analysis, was qualified as an expert in *Sokolow*. *See, Sokolow*, No. 04-cv-397 (S.D.N.Y.) (docket entry 837 at 79).

*Second*, while experts may not "simply transmit…hearsay to the jury," they may apply their extensive experience and a reliable methodology to form their own opinion as to inadmissible materials. *U.S. v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Eviatar did just that. He applied his extensive experience and knowledge as a senior intelligence officer in the IDF and the Israeli Ministry of Defense with particular expertise over a long career on Palestinian affairs to determine, using the types of materials and sources that an intelligence officer would use in like circumstances, who likely killed Gilmore. Utilizing his expertise and those materials, Eviatar provided certain background as to Force-17 and its place within the Palestinian Authority hierarchy, the significance of Arafat's order to Force-17 members to commit terror attacks in Jerusalem, and the interrelationships between Force-17 members and its command structure. He also explained, *inter alia*, how an intelligence officer would view and use the evidence in this case. [DE-342-3,7-12,22-26].

Eviatar did not simply relay that evidence to the court. He explained each item's significance from the perspective of an intelligence officer. For example, Eviatar explained, *inter alia*:

- Why an intelligence officer would consider an Israeli governmental report reliable, including that it was reprinted in the Force-17 official magazine. *Id*. at 13-14.

- The significance of the fact-checking conducted by Issacharoff concerning Aweis' statement in *The Seventh War*. *Id*. at 16.

- The significance of the particularly close relationships between Khatib, Mislamani and Halawa, as close associates in the various Fatah terror groups, which make their consistent statements concerning Halawa and the Gilmore attack particularly reliable to an intelligence officer. *Id*. at 17-19.

Thus, Eviatar's report reflects the application of his "extensive experience and reliable methodology" as an intelligence officer to "put factual evidence in context." *See Mejia*, 545 F.3d at 197; *Strauss*, 925 F.Supp.2d at 445. It should have been considered in assessing Defendants' summary judgment motion.

## <u>CONCLUSION</u>

For the reasons set forth herein, the order of the court below should be vacated and this case remanded, with instructions to reassign the case, for further discovery and trial.

Dated: Baltimore, Maryland
      July 13, 2015

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs-Appellants*

by: _____
      Meir Katz
Robert J. Tolchin, Esq.
Meir Katz, Esq.
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
RTolchin@berkmanlaw.com
MKatz@berkmanlaw.com

ARNOLD & PORTER, LLP
Kent A. Yalowitz, Esq
399 Park Avenue
New York, New York10022-4690
(212) 715-1113
Kent.Yalowitz@aporter.com

**CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 32(a)(7)**

Pursuant to Rule 32(a)(7) and Circuit Rule 32(a)(1) of the Rules of this Court, I certify that this brief contains 13,741 words. This word count was made by use of the word count feature of Microsoft Word, which is the word processor program used to prepare this brief. This word count includes the whole brief from the jurisdictional statement through the conclusion, including footnotes.

Dated:      Baltimore, Maryland
              July 13, 2015


                                      /s/ Meir Katz
                                  Meir Katz

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 13, 2015, I filed the foregoing using the ECF system, which is expected to electronically serve counsel of record of all parties before this Court.

_____/s/ Meir Katz_____
Meir Katz

# STATUTORY ADDENDUM

# Table of Contents

18 U.S.C. §2331(1) ............................................................... a3

18 U.S.C. §2333(a) .............................................................. a3

18 U.S.C. §2339A ............................................................... a4

## 18 U.S.C. §2331 -- Definitions

As used in this chapter—

(1) the term "international terrorism" means activities that—

    (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

    (B) appear to be intended—
        (i)   to intimidate or coerce a civilian population;
        (ii)  to influence the policy of a government by intimidation or coercion; or
        (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

    (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

## 18 U.S.C. §2333 – Civil Remedies

(a) **Action and Jurisdiction**.— Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

## 18 U.S.C. §2339A -- Providing Material Support to Terrorists

**(a) Offense**.— Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842 (m) or (n), 844 (f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123 (b) of title 49, or any offense listed in section 2332b (g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

**(b) Definitions**.— As used in this section—

**(1)** the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

**(2)** the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

**(3)** the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.